| | | |
|---|---|---|
| DOCKET NO: | : | SUPERIOR COURT |
| HHD-LND-CV-15-6061807-S | : | |
| | : | |
| | : | |
| JANET LOWE, AMIN M. KESHWANI, | : | |
| LING-CHUAN CHU, HELEN JANE | : | |
| FRIED, and MARYLLYN DONNA | : | J.D. OF HARTFORD |
| FAIRFIELD | : | |
| | : | AT HARTFORD |
| V. | : | |
| | : | |
| PLANNING AND ZONING COMMISSION | : | |
| OF THE TOWN OF MANSFIELD | : | December 20, 2015 |

## AMENDED APPEAL AND COMPLAINT

## INTRODUCTION

**1.** To the Superior Court Land Use Docket for the Judicial District of

Hartford, at Hartford, come **JANET LOWE, AMIN M. KESHWANI, LING-**

**CHUAN  CHU, HELEN JANE FRIED,** and **MARYLLYN DONNA**

**FAIRFIELD,** to bring this amended special permit zoning appeal and the

claims of  Fair Housing Act ("FHA") violations against them under both state and

federal law,  pursuant to CT Gen. Stat. Sec.46a-64c and 42 U.S.C. Section 1982

and 42 U.S.C. Section  3604, and they also claim discrimination against them,

pursuant to the state constitution, CT. Const. Article XXI and the U.S.

Const. amend, XIV, against the named defendant, **PLANNING AND ZONING**

**COMMISSION  OF THE TOWN  OF MANSFIELD,** stemming from both the

Town's zoning process and the specific decision in the special permit approval of

Adam Lambert on June 15, 2015.

PARTIES

2. At all times mentioned herein, the plaintiff Janet Lowe, who over the age of 65, lived and was the owner of the property known as 12 Olsen Drive, Mansfield, Connecticut 06250.

3. At all times mentioned herein, Amin M. Keshwani was the co-owner of property known as 61 Olsen Drive, Mansfield, Connecticut 06250.

4. At all times mentioned herein, Ling-Chaun Chu was the co-owner of property known as 61 Olsen Drive, Mansfield, Connecticut 06250.

5. At all times mentioned herein, Helen Jane Fried was the co-owner of property known as 39 Olsen Drive, Mansfield,  Connecticut 06250, was over the age of 65 and had a disability that significantly impacts a major life activity, as understood under the Americans with Disability Act, ("ADA") with her Affidavit, Exhibit A, incorporated by reference herein.

6. At all times mentioned herein, Maryllyn Donna Fairfield was the co-owner of the property known as 39 Olsen Drive,  Mansfield, Connecticut 06250 and has had two disabled elderly parents over the age of ninety years living with her at this property for six months out of the year.

7. At all times relevant to this Complaint, the defendant, the Planning and Zoning Commission of the Town of Mansfield, agents for the Town of Mansfield, are/were, with their address Audrey P. Beck Municipal Building, 4 South Eagleville Road, Mansfield, CT 06268 and were responsible for special permit

zoning application assessment and receive federal FHA funding.

<u>EXHAUSTION OF REMEDIES</u>

8.   The Fair Housing Act does not require exhaustion of administrative remedies
     and administrative agency  review is unnecessary when the process is
     constitutionally infirm.

<u>FACTS</u>

.    9. The plaintiff Lowe's property at 12 Olsen Drive is within 100 feet of the
        property known as 17 Olsen Drive, Mansfield (hereinafter, the "Subject
        Property".)

10. The plaintiff Keshwani's property at 61 Olsen Drive abuts the Subject
    Property.

11. The plaintiff Chu's property at 61 Olsen Drive abuts the Subject Property.

12. The plaintiff Fried's property  at 39 Olsen Drive, is within the "Mulberry
    Village"  ( defined  area of  Olsen Drive), as includes the Subject Property.

13. The plaintiff Fairfield's property at 39 Olsen Drive, is within the "Mulberry
    Village" area of Olsen Drive as includes the Subject Property.

14. On June 15, 2015, the defendant Planning and Zoning Commission of the
    Town of Mansfield (the "Commission") granted a special permit
    application made by Adam Lambert of 17 Olsen Drive to construct an
    Efficiency Unit, two bedroom, on the Subject Property.

15. Notice of the decision made by the Commission on June 15, 2015, was
    published in the Chronicle on June 22, 2015.

16. In granting the application, resulting in a zone change, the Commission

acted unlawfully, arbitrarily, capriciously, and in abuse of the discretion
vested in it, in one or more of the following ways:

  a. It failed to provide adequate notice of the proposed change of zone as
    provided by Sec. 8-3 of the Connecticut General Statutes;

  b. It failed to follow the guidelines set forth in its own Plan of Conservation
    and Development;

  c. It failed to adhere to the standards set forth in its own regulations

17. In granting the special permit application, the Commission acted
  unlawfully,  arbitrarily, capriciously, and in abuse of the discretion vested
  in it, in one or more of  the following ways:

  a. It noticed an application to the public with erroneous information of
    intended use and of acreage amount.

  b. It failed to comply with its own standards for the granting of an
    efficiency permit by allowing property with less than 40,000 square feet
    to develop an efficiency unit.

  c. It failed to comply with its own standards by granting an efficiency unit
    for the  purposes of acting as a source of income without establishing in
    the record the financially overburdened status of the applicant.

  d. It allowed a Multi-family Unit at Subject Property, which is not a
    permitted use within the RAR-90 Zone District because two bedroom
    efficiency units create two independent living facilities with provisions
    for living, sleeping, eating, cooking and sanitation.

  e. It allowed a two-bedroom efficiency to be granted when the Plan of

4

Conservation and Development Committee rejected two-bedroom efficiency use.

18. The actions of the Commission, acting outside of its own standards, will have a  disparate impact on the elderly in the area defined as within the Mulberry Village and in the Town of Mansfield incorporating by  Reference Exhibit A.

19. In conducting the Commission discussion on the application, the Commission, acting through its Chairman, JoAnn Goodwin, improperly and unlawfully limited discussion by a Commission member, Binu  Chandy, regarding the financial  burden language, of special permits, Mansfield Zoning Regulations Article X, for efficiency Units for commercial use.

20. The Commission would not consider disparate impact claims that the special permit would have on the elderly with disabilities because it stated that their process of review would not allow for consideration of those concerns, incorporating  herein by reference Exhibit A,  facts addressing the features of Olsen Drive that made the elderly disabled residents there, more than any other age group, to be apprehensive in walking after a granting of the special permit because their resultant reduced  walking would predictably limit good health related outcomes.

21. Plaintiff Helen Jane Fried, requested an accommodation that, as a resident in the neighborhood with a disabling condition, aged but not infirmed,  that the Commission consider the disparate impacts

and needs of the disabled elderly before granting the special permit

application before them, that accommodation was denied; actions

of less discriminatory impacts, such as referring the raised issues to

their Town Attorney for consultation could have been undertaken.

22. The Commission's adherence to their current zoning process, not to

consider concerns about a  special permit application raised

during public hearing, has or will have the discriminatory impact

on the disabled elderly in Town by limiting their ability to obtain and

retain the use of appropriate housing; this practice has or will also

segregate the disabled elderly and depriving residents of Town the

opportunity to live in a disabled elderly integrated community.

23. The plaintiffs are aggrieved by the Commission's approval of the

special permit application,  the unconstitutional process in which the

Commission granted it and the reckless disregard for the elderly

disabled that the Commission's unwillingness to consider any of the

publicly raised concerns about harm to the elderly disabled expressed.

24.  Plaintiff Fried suffered, and suffers, severe emotional distress and

mental anxiety that her concerns would not be considered by the

Commission knowing how many others like her would suffer,

incorporating herein by  reference Exhibit A, as there is a large

percentage of elderly disabled on Olsen Drive, that need to walk for

good health outcome, that will not feel able to walk because of

apprehensions raised by the number of student age drivers residing or

visiting Olsen Drive when rentals, efficiency units, and multi-housing units are allowed to increase in this neighborhood that is situated a university community  and within close commuting distance to a second university.

### COUNT ONE-ZONING CODE VIOLATION

1-24. Paragraphs 1 through 24 of the above Facts, with Exhibit A, are hereby incorporated by  reference as paragraphs 1 through 24 of the First  Count.

25. The conduct of the Commission violated the Zoning Regulations of the Town of Mansfield..

### COUNT TWO-FAIR HOUSING VIOLATIONS-UNDER STATE LAW

1-25.  Paragraphs 1 through 25 of the above facts, are hereby incorporated as paragraphs 1 through 25 of  the Second Count.

26. The conduct of the defendant violated the Fair Housing Act, CT Gen. Stat. Sec. 46a-64c.

### COUNT THREE-FAIR HOUSING VILATIONS-UNDER FEDERAL LAW

1-25. Paragraphs 1 through 25 of the above facts are hereby incorporated as paragraphs 1 through 25 of the Third Count.

27. the conduct of the defendant violated the Fair Housing Act, 42 U.S.C. Section 3604 and 42 U.S.C. Section 1982.

### COUNT FOUR-STATE CONSTITUTIONAL VIOLATIONS

1-25.  Paragraphs 1 through 25 of the above facts, incorporated as paragraphs 1 through 25 of the Fourth Count.

28. The Conduct of the defendant violated CT. Const. Article XXI.

## COUNT FIVE-FEDERAL CONSTITUTIONAL VIOLATIONS

1-25. Paragraphs 1 through 25 of the above facts, incorporated as paragraphs 1 through 25 of the Fifth Count.

29. the conduct of the defendant violated U.S. Const. amend, XIV.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully pray that this Court take jurisdiction over this case, sustain this zoning appeal, find violations under the federal and state Fair Housing Act, find discrimination under the federal and state constitutions and pray that the following relief there from be ordered:

a. The plaintiffs be compensated for the emotional harm they have suffered;

b. The plaintiffs be awarded reasonable attorney fees and costs;

c. The plaintiffs be awarded punitive damages;

d. The plaintiffs be awarded economic damages incurred.

e. Such other relief as the Court deems appropriate.

RESPECTFULLY SUBMITTED,

THE PLAINTIFFS,
By, /s/405924_____
Arthur A. Smith
Law Offices of Arthur A. Smith
28 Grand Street
Hartford, Connecticut 06106
Tel. (860) 724-3333
Fax. (860) 550-6779
attyasmith@aol.com

<u>CERTIFICATION</u>

A copy of the foregoing was emailed, first class postage prepaid on this 20th day
of December, 2015 to counsel of record, Attorney Kevin Deneen,  O'Malley, Deneen,
Leary. Messian,& Oswcki, 20 Maple Avenue, Windsor, CT 06095 and certified mail,
#7014 3490 0000 1492 0877, to Adam Lambert, 17 Olsen Drive, Mansfield, CT. 06250.


<u>/s/ Juris #405924</u>

Arthur A. Smith, Esq.



## AFFIDAVIT OF HELEN JANE FRIED

I, Helen Jane Fried, am over the age of eighteen, of sound mind, believe in the obligation of an oath and affirm that the following statements, hereby sworn to under oath and and under penalty of perjury under the laws of the United States, to be correct and true:

1. My name is Helen Jane Fried and I live at 39 Olsen Drive, Mansfield, Connecticut ("Town"), where I have lived for forty (40) years.

2. I am over the age of 65 and have a disability that significantly impacts a major life activity, as understood under the Americans with Disability Act, ("ADA").

3. I have been found by my treating phsyician to have a disability that substantially limits a major life activity.

4. My employer, Connecticut Central State University ('CCSU"), has granted me employment accommodations, as understood under the ADA,  see attached document, Attachment A.

5. My disability treatment plan requires, for good health outcomes, that I maintain  regular excercise.

6. I follow my treatment plan objectives of exercise by walking in my neighborhood, on  Olsen Drive.

7. Olsen Drive is a public Road.

8. Olsen Drive is a circular loop with a downward slope with limited vision of approaching traffic.

9. Olsen Drive is heavily vegetated at the lowest point of the sloping curve.

10. Olsen Drive does not have sidewalks.

11. Olsen Drive does not have public lighting.

1

12. Olsen Drive has no speed bumps.

13. Olsen Drive does not have a shoulder, defined as a portion of the roadway contiguous with the traveled way for accommodation of stopped vehicles for emergency use.

14. Olsen Drive does not have yellow line crosswalks nor yellow line mid-road demarcations.

15 Olsen Drive does not have a water drainage system.

16. Olsen Drive residents, and their visitors, have the pattern and practice of parking their vehicles on that road for limited but unregularted periods of time.

17. Olsen Drive, also known as Mulberry Village, ("MV") is comprised of seventeen (17) houses.

18. Olsen Drive has a large percentage of owners over the age of 65, who have know disabilities, as understood under the ADA, more than half, **52%** , nine (9) out of seventeen (17) properties, and if in-law elderly long-term guests with disabilites, my in-laws who stay six months out of the year, are included,  that number rises to **64%** . Seventy (**70%** ) percent of home owners. twelve (12) in the owners of the seventeen (17) properties, are over the age of 65. If those two long-term guest are included, in fourteen (14) out of seventeen (17) properties, **82%** are over the age of 65.

19. Olsen Drive elderly residents, those identified  in the above statement with disabilities, have a pattern and practice of walking on Olsen Drive as a part of their treatment plan objectives and to increase good helath outcomes.

20. I have a doctorate degree in counseling.

21. I have talked with elderly neighbors with disabilites living  on Olsen Drive about their need to continue walking routines in the nieghborhood  to maintain good health outomes.

22. I understand from talking with elderly neighbors living on Olsen Drive, not as a therapist but in a neighbor to neighbor capacity, that they have a growing apprehnsion that Olsen Drive is becoming unsafe to walk on because of the increasing number of young, college age, drivers driving on that road and because of the increased number of vehicles percieved to be traveling on Olsen Drive.

23. I also have increasing apprehension about walking on Olsen Drive and have limited my walking excercise, a part of my medical treatment objectives, because of the fear for my safety, as a pedistrian, for the same reasons as outlined above in statement number 22.

24. Olsen Drive is located in a college town, the University of Connecticut ("UConn"), Storr's campus, is located there.

25. Olsen Drive is also within close communting distance to Eastern Connecicut State University

2

(" ECSU") in Willimantic, a neighboring town.

26. I have observed that Olsen Drive's fastest growing resident and visitor population is of college age students observed to be between the ages of 18-26.

27. As a professional with educational training in off campus housing, I ran an off campus housing office in Trenton, New Jersey at Treton State College (TSC"), I know that the college age group, 18-26, has more automobile accidents, with higher insurance costs, than any other age group and that alcohol consumption is a major contributing factor in their automobile accidents.

28. I also know to be true that the greater number of vehicles in an area increases the likelihood of a site being dangerous to pedestrians, and that pedistrians sixty-five ( 65) and older acount for the the highsest pedestrian fatality rate, than all other ages groups, (U.S. D.O.T. Traffic Safety Facts 2011).

29. I also know to be true that students moving into a neighborhood, as they did at TSC, change the ethos of the setting and often require increased police enofrcement interventions.

30. Because of the reasons listed above, and my professional training,  resulting in my belief that I would be further  harmed  by further increased apprehension about my safety as a pedestrian, with greater reluctance to walk, and with increased, both professional and non-professional, concerns that other elders with ("ADA") disabilities on Olsen Drive would be further  harmed, I attended the special permit application hearing, held by the Planning and Zoning Commission of the Town of Mansfield ("the Commission") on June 15, 2015, where they were to evaluate the two-bedroon efficiency special permit application of Adam Lambert of 17 Olsen Drive. Please see ATTACHMENT B articles defining "apprehension as a health outcome cost": *Associations of Perceived Neighborhood Environment on Health Status in Persons with Arthritis*; *Environments and Heallth: Planning Decisions As Public -Health Decisions*; *Pedestrian Environment Data Audit Protocol*; *Pedestrian Environment Data-Worksheet, Walkability Checklist* (U.S.D.O.T.) *Taffic Safety Facts-Pedestrians* (U.S.D.O.T.)

31. The notice of the June 15, 2015 special permit hearing had been published in The Chronicle on June 2, 2015 and June 10, 2015, both times stating that more information about the application could be obtained at the A.P. Beck Building, ("Town Hall").

32. The special permit application of Adam Lambert, ("SPA")  referred to in the published notices,did not indicate that the two bedroom efficiency was intended for  commercial use. Financial need  was not established in the hearing record, as required by zoning regualtion for commercial use ,nor during the Commission  deliberation phase did the Chairperson allow consideration of financial need.

33. The SPA submitted by Mr. Lambet indicated that his  property was an acre lot, not a .9 acre

3

parcel, that it was later found out to be.

34. The .9 acre parcel in Mr. Lambert's SPA, under review by the Commission, did not meet the 40,000 square feet use and dimensional requirements zoning requirements of Article X, Section L.2.a.

35. Incorporating the statements made by speakers before me ( that the elderly with infirmities would be disproportionately impacted by increased student housing and that resources would be lost to the elderly in the Olsen Drive community should the SPA be approved), as a walker on the cul de sac, who lived in my house for 40 years, aged but not yet infirmed, I am ADA qualified but found to be able to work with accommodations, I asked the Commission to consider enforcement problems depending on who moves into the neighborhood with these raised concerns in mind. My request for accommodation, the consideration of these issues, was denied. The Commission's denial was a reckless disregard for my rights and the rights of the other disabled elderly on Olsen Drive, and in the Town of Mansfield, for that matter

36. In deliberation, the Commission stated that outside of the regulatory requirements the zoning **process** did not allow for the consideration of the raised issues presented by the speakers during the public Lambert SPA hearing, here the disparate impact of increased student housing on the disabled elderly in the community.

37. The Commission's adoption and enforcement of the Town's zoning regulations in the special permit application process has or will have a discriminatory effect on the disabled elderly on Olsen Drive and in Town by virtue of its significant disparate impact on their ability to obtain housing in the Town allowing for perceptions of safe pedestrian mobility, to the detriment of their good health outcomes, compared with the non-disabled younger age groupings in violation of the Fair Housing Act, with which, I am professionally familiar. The Town's zoning regulation process without such considerations of disparate impact, as we raised during the public hearing for consideration, will also have the effect of perpetuating segregation by excluding the disabled elderly minorities from the Town's neighborhoods and thereby depriving current residents of the Town of the opportunity to live in a disabled elderly integrated community. For those reasons, the Town's special permit application reveiwing **process**, from beginning through administrative Zoning Board of Appeal, is illegal.

38. The Town has articulated no rational reason or otherwise legitimate governmental purpose justifying the zoning regulation special permit reviewing **process** that would otherwise obviate the substantially disproportionate effect against the disabled elderly minorities. Alternatively, assuming arguendo that such a rational reason or legitimate governmental purpose existed, the Town could still have accomplished its goals in a manner having a less discriminatory effect on the disabled elderly on Olsen Drive, who are and will be denied opportunities to enjoy the benefits of their dwellings, sufficient perceptions of pedestrian safety to allow for mobility to

4

Maintain good health outcomes, in Town under the existing special permit zoning process.

39. In my professional opinion, as agents for the Town, the Commission has engaged in disparate impact discrimination in violation of the federal Fair Housing Act, as amended, and under the state's comparable Fair Housing requirements through their existing zoning regulations for the special permit application review **process** proves, from that beginning through the administrative Zoning board of appeal.

40. In my professional opinion, as agents for the Town, the Commission intentionally discriminates against the disabled elderly, as in this hearing, when it participates in a **process** where testimony is provided that a protected class will be disparately impacted and it fails, even minimally, to continue the hearing process to a further date in order to obtain legal counsel on whether those raised issues may be taken into consideration.

41. I have been embarrassed and humiliated by the actions of the Commission, as described above.

Helen Jane Fried

Sworn to before me

On this _17th_ day of December, 2015, as Notary Public.

COMMISSIONER OF THE SUPERIOR COURT
Juris # 405924

**Affidavit of Helen Jane Fried**
**Attachment —A**

# CTHR

### State of Connecticut Human Resources
## Medical Certificate
Return to:

*Agency Name:* Central Connecticut State University *Attn: Human Resources*
*Address:* 1615 Stanley Street, New Britain CT 06050-4010   *FAX:* (860) 832-2342
**Must be submitted within 30 days of foreseeable leave, if leave is FMLA qualifying.**

Form #:  P33A - Employee
Revision Date: 2/2011          To be used by employee who is absent for personal illness, including FMLA absences.

| | |
|---|---|
| **AGENCY INSTRUCTIONS** | This medical certificate is to be used by an employee who is or will be absent for health reasons including the birth of a child. It shall be given to the employee or sent directly to his physician or practitioner. The name of the person and the address of the agency to which this certificate is to be returned shall be inserted in the space provided. The PHYSICIAN OR PRACTITIONER will generally return the filled out certificate to the agency head or authorized representative. Fill in employee's name, position and address below. |

| **AGENCY FILL IN** | | | | |
|---|---|---|---|---|
| Agency Head or Representative<br>Norma Rivera | | Agency Name<br>Central Connecticut State University | | |
| Agency Address *(No. and Street)*<br>1615 Stanley Street | | *(City or Town)*<br>New Britain | *(State)*<br>CT | *(ZIP Code)*<br>06050 |
| Employee's Name and Employee's Number<br>Helen Jane Fried - #173965 | | | | |
| Employee's Position<br>Professor | | Department<br>Counseling & Family Therapy | | |
| Address *(No. and Street)*<br>39 Olsen Drive | | *(City or Town)*<br>Mansfield | *(State)*<br>CT | *(ZIP Code)*<br>06250 |

| **CONDITIONS GOVERNING ISSUANCE** | No sick leave, federal FMLA, state family/medical leave (C.G.S. 5-248a), special leave with pay in excess of five (5) days, or leave as otherwise prescribed by contract, shall be granted state employees unless supported by a medical certificate filed with, and acceptable to, the appointing authority. The period of incapacity (including, in the case of pregnancy, the period of time before and after birth when the employee is unable for medical reasons to perform the requirements of her job) must be reported with a description of the nature of the incapacity entered under (2) and/or (7).<br><br>The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services. |
|---|---|

| **This form must be executed by a physician or practitioner whose method of healing is recognized by the State, except where otherwise indicated.**<br><br>**Note:** The health care provider must practice in the specialty for which the patient is being treated. | (1) Pages 3-4 of this form describes what is meant by a **"serious health condition" / "serious illness"** under federal FMLA and state family/medical leave (C.G.S. 5-248a). Does the patient's condition qualify under any of the categories described? *(Please be sure to refer to pp. 3 and 4 for specific definitions.)* _Yes_ If yes, please check the appropriate category:<br>*(fill in "yes" or "no")*<br>___ Inpatient care with overnight stay   ___ Permanent/long-term conditions requiring supervision<br>___ Incapacity and treatment   ___ Multiple treatments (non-chronic conditions)<br>___ Pregnancy (includes prenatal)   ___ None of the above<br>_X_ Chronic conditions requiring treatments<br><br>(2) If this absence is for an FMLA qualifying reason, describe the medical facts that support your certification, including a brief statement as to how the medical facts meet the criteria of one of the categories on pages 3-4. If this absence is not for an FMLA qualifying reason, describe the medical facts that support your certification of the employee's medical condition and incapacity from work. If additional space is needed, continue remarks under Section (7). *Scleroderma and Raynaud's cause fatigue which prevents a full course load — 80% is OK*<br><br>(3) (a) Answer the following:<br>1. The approximate **date** the condition commenced. *2009*<br>2. The probable **duration** of the condition. *Permanent*<br>3. The probable duration of the patient's present **incapacity** (if different from (3)(a) 2. above).<br><br>4. The date of the employee's most recent examination for the condition. *6/4/2015*<br><br>(b) Will it be necessary for the employee to take work only **intermittently** or on a **reduced schedule** as a result of the condition (including for treatment described in **ITEM (4)** below)? _____ If yes, give the probable **duration** and frequency. _____<br>*(fill in "yes" or no")*   *(fill in no. of months or days, etc.)* |
|---|---|

1

(c) If condition is a **chronic condition** (as checked off under Section (1)) or **pregnancy**, state whether the patient is presently incapacitated and the likely duration and frequency of episodes of incapacity:

_____ Patient _____ is _____ is not presently incapacitated. *(check one)*

Going forward, estimate the:

**Duration** of episodes of incapacity = _____ *(hours or days, etc.)*

_____ **Frequency** of episodes of incapacity = _____ *(no. of times per week or month, etc.)*

(4) (a) If **additional treatments** will be required for the condition and/or the patient will be absent from work or other daily activities because of treatment on an **intermittent** or **part-time** basis, provide:

_____ An estimate of the probable **number** of such treatments. _____

_____ An estimate of the probable **interval between** such treatments. _____

_____ An actual or estimated **dates** of treatment, if known. _____

_____ Period required for **recovery**, if any. _____

(b) If any of these treatments will be provided by **another provider of health services** (e.g., physical therapist), please state the nature of the treatment and period of time covered.

_____

_____

_____

(c) If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment). _____

_____

**TO BE FILLED IN BY ATTENDING PHYSICIAN OR PRACTITIONER**
*(Please print legibly.)*

(5) (a) During the period of incapacity, is the employee **able to perform work of** *any* **kind**?

Yes
*(fill in "yes" or "no")*

(b) If able to perform some work, is the employee **unable to perform any one or more of the essential functions of the employee's job** (if FMLA leave or if relevant, a job specification is enclosed for your convenience)? Yes
*(fill in "yes" or "no")*

If yes, elaborate. *Reduce Teaching load to 50% due to Chronic fatigue — No Administrative Responsibility*

(c) If neither (4)(a) or (4)(b) applies, is it necessary for the employee to be absent from work for treatment? _____
*(fill in "yes" or "no")*

(6) The employee will be able to return to ☐ **regular** or ☐ **selective work** on

_____ *(date)*. If selective work, explain under number (7) below.

(7) Additional remarks: _____

_____

_____

_____

_____

---

Name of Physician or Practitioner **AND** Physician or Practitioner License Number *(please type or print)*
KENNETH R. DARDICK, MD          Lic # 17773
MANSFIELD FAMILY PRACTICE

Address MANSFIELD PROFESSIONAL PK          *(City or Town)*          *(State)*          *(ZIP Code)*
STORRS, CT 06268

Signed *(Physician or Practitioner)*          Date 6/4/2015          Telephone 860 487-0002

2

Dr. Helen Jane Fried, Professor, Central Connecticut State University

Requirements for a full-time professor normally consist of teaching four 3-credit courses for a total of 12 load hours. Such courses require faculty input during class, preparation for class and assessment of student work. Full-time faculty also hold scheduled office hours totaling at least five hours per week and attend faculty and/or department meetings.

1. What is the nature of Dr. Fried's condition or impairment for which she is being treated and requesting job modifications? Please include in your description how the condition or impairment manifests itself.

   *Scleroderma — fatigue, exhaustion, diarrhea, distal fingertip ulceration, digestive abnormality*

2. Since what date has Dr. Fried had this condition or impairment?

   *2005*

3. For each symptom of Dr. Fried's illness(es), please describe its duration, severity and frequency.

   *Digestive problems — chronic*
   *Ulcerations — worse with low temperature*
   *Fatigue — worse with low temperatures*

4. What functions or activities does Dr. Fried have difficulty performing as a result of her condition and why?

   *Exhaustion and fatigue limit her ability to teach for more than 2.5 hours twice a week*

5. With regard to each function or activity listed above, describe in detail how and to what extent each is limited.

   *See above # 1, 3, 4*

6. With regard to each function or activity listed above, please indicate the time period (duration) that you anticipate each to be limited.

   *Chronic — no expectation of improvement*

7. To your knowledge, has Dr. Fried been treating with any other physician(s) for this or any other condition that has contributed to her inability to work? If yes, who?

   *Dr. I. Stanescu (Rheumatology)*

KENNETH R. DARDICK, MD
MANSFIELD FAMILY PRACTICE
MANSFIELD PROFESSIONAL PK
STORRS, CT 06268

_____          _____ *5/29/2015*
Name and Address of Physician or Practitioner      Signed (Physician or Practitioner)/date

*CT License # 17773*

**Affidavit of Helen Jane Fried**
**Attachment- B**

Arthritis Care & Research
Vol. 62, No. 11, November 2010, pp 1602–1611
DOI 10.1002/acr.20267
© 2010, American College of Rheumatology

ORIGINAL ARTICLE

# Associations of Perceived Neighborhood Environment on Health Status Outcomes in Persons With Arthritis

KATHRYN REMMES MARTIN, JACK SHREFFLER, BRITTA SCHOSTER, AND LEIGH F. CALLAHAN

*Objective.* To examine the association between 4 aspects of perceived neighborhood environment (aesthetics, walkability, safety, and social cohesion) and health status outcomes in a cohort of North Carolinians with self-reported arthritis after adjustment for individual and neighborhood socioeconomic status covariates.

*Methods.* In a telephone survey, 696 participants self-reported ≥1 types of arthritis or rheumatic conditions. Outcomes measured were physical and mental functioning (Short Form 12 health survey version 2 physical component and mental component summary [MCS]), functional disability (Health Assessment Questionnaire), and depressive symptomatology (Center for Epidemiologic Studies Depression Scale scores <16 versus ≥16). Multivariate regression and multivariate logistic regression analyses were conducted using Stata, version 11.

*Results.* Results from separate adjusted models indicated that measures of associations for perceived neighborhood characteristics were statistically significant ($P \leq 0.001$ to $P = 0.017$) for each health status outcome (except walkability and MCS) after adjusting for covariates. Final adjusted models included all 4 perceived neighborhood characteristics simultaneously. A 1-point increase in perceiving worse neighborhood aesthetics predicted lower mental health ($B = -1.81$, $P = 0.034$). Individuals had increased odds of depressive symptoms if they perceived lower neighborhood safety (odds ratio [OR] 1.36, 95% confidence interval [95% CI] 1.04–1.78; $P = 0.023$) and lower neighborhood social cohesion (OR 1.42, 95% CI 1.03–1.96; $P = 0.030$).

*Conclusion.* Study findings indicate that an individual's perception of neighborhood environment characteristics, especially aesthetics, safety, and social cohesion, is predictive of health outcomes among adults with self-reported arthritis, even after adjusting for key variables. Future studies interested in examining the role that community characteristics play on disability and mental health in individuals with arthritis might consider further examination of perceived neighborhood environment.

## INTRODUCTION

Sex and race, as well as individual-level socioeconomic status (SES) markers such as education, income, and occupation, are differentially associated with arthritis (i.e., incidence, disease severity, access to care, and health outcomes) (1,2). In efforts to go beyond these individual-level determinants of health and contributors to health disparities, greater attention is now being given to understanding

the influence of the neighborhood (or community) environment on health status outcomes and individual health behaviors. Area of residence can be particularly important given the uneven spatial distribution of goods, services, educational facilities, and resources through natural (e.g., geographic landmarks like lakes and mountains) and manmade (e.g., political, economic, or self-imposed segregation) clusterings of individuals. Typically, there are 3 ways that researchers examine the effect of neighborhood on

Supported by a grant from the National Institute of Arthritis and Musculoskeletal and Skin Diseases Multidisciplinary Clinical Research Center, Rheumatic Diseases (P60-AR49465-01). Manuscript preparation was supported by a Thurston Arthritis Research Center Training grant (5T32-AR007416).
Kathryn Remmes Martin, PhD, MPH, Jack Shreffler, PhD, Britta Schoster, MPH, Leigh F. Callahan, PhD: University of North Carolina at Chapel Hill.
Dr. Shreffler has received consultancy fees, speaking fees, and/or honoraria (less than $10,000) from the NIH Patient-Reported Outcomes Measurement Information System Assessment Center Usability Meeting. Dr. Callahan has re-

ceived consultancy fees, speaking fees, and/or honoraria (less than $10,000 each) from the NIH, the Canadian Arthritis Network, the University of Washington Pain Behaviors Study, and the National Association of Chronic Disease Directors.
Address correspondence to Leigh F. Callahan, PhD, 3300 Thurston Building CB #7280, University of North Carolina at Chapel Hill, Chapel Hill, NC 27599. E-mail: Leigh_Callahan@med.unc.edu.
Submitted for publication March 12, 2010; accepted in revised form May 24, 2010.

health: through the use of administrative data (e.g., US Census data), through the use of trained raters who systematically observe and characterize the physical and/or social attributes of neighborhoods, and through the use of self-reported perception of neighborhood conditions (3,4).

Although the independent effect of neighborhood SES on outcomes like mortality, chronic disease, mental health, and health behaviors has been established in numerous studies of the general population (5,6) as well as of older adults (7), the relationship between neighborhood SES and arthritis outcomes has only recently been established (8–12). Several studies conducted in the UK and the US have examined the relationship of community SES and health outcomes in individuals with rheumatoid arthritis (RA) (8), inflammatory polyarthritis (9), and systemic lupus erythematosus (10), as well as the prevalence of and health-related quality of life in people with self-reported arthritis (11,12), using aggregate measures like the Carstairs score, Townsend score, Index of Multiple Deprivation, and US Census variables as indirect, "objective" proxy for neighborhood characteristics. All have found that living in areas of greater deprivation is related to poorer arthritis-related outcomes (e.g., physical functioning, functional disability, and depressive symptoms).

In addition to these objective measures of the neighborhood environment, attention has been given to the significance of perceived neighborhood characteristics. Perceptions can be grounded in observable conditions (13) or there can be incongruities between perceived neighborhood environment and objective reality (14,15). It has been theorized that neighborhood perceptions are important to examine because they can elicit psychosocial or psychological processes (13,16–18), or even a physiologic stress response that can affect mental and physical health (19,20).

Current research aimed at better understanding which neighborhood attributes influence health is grounded in the practical and theoretical knowledge generated from decades of social science and public health research (5). Constructs borne out of psychology and sociology, such as social disorder and social cohesion, as well as public health infrastructure features like the presence of sidewalks, have been developed as ways to more objectively measure neighborhood characteristics. Typically, researchers identify constructs or neighborhood features of relevance to general (e.g., self-rated health) or specific (e.g., cardiovascular or asthma outcomes) health outcomes depending on their research question (3,5,21).

In studies conducted with the general population, perceptions of both physical (e.g., quality, facilities, problems, and walkability) and social (e.g., social cohesion and social control) aspects of neighborhood environment have been linked to self-rated health (22–24), physical functioning (25), and mental health outcomes (26–30), as well as health behaviors like smoking, drinking, and walking for exercise (29). Among older adults, better self-rated health has been associated with perceiving higher quality in area facilities, neighborliness (31), and physical environment (16). Mobility disability has also been associated with lower perceived neighborhood safety among lower-income, retirement-age adults (13).

Neighborhood perceptions have also been shown to influence specific disease outcomes. Mujahid et al found that individuals who self-reported better neighborhood characteristics (e.g., walkability, availability of healthy foods, safety, and social cohesion) were less likely to be hypertensive, even after adjustment for individual-level characteristics of age, sex, and SES (education and income) (32). Greater perceptions of neighborhood problems (e.g., traffic, noise, trash, smells, and fires) have been associated with lower quality of life, worse physical functioning, and greater depressive symptoms among individuals with asthma, cross-sectionally (21) and prospectively (33). Greater perceptions of neighborhood problems were also associated with smoking and high blood pressure among adults with diabetes mellitus (34). To date, no one to our knowledge has examined the role of perceived neighborhood environment on the health outcomes of adults with arthritis. The purpose of this study was to examine the association between 4 aspects of the perceived neighborhood environment (aesthetics, walkability, safety, and social cohesion) and self-reported health status outcomes in a cohort of North Carolinians with self-reported arthritis after adjustment for individual and objective neighborhood SES.

## SUBJECTS AND METHODS

**Study design.** The North Carolina Family Medicine Research Network (NC-FM-RN) was established in 2001 as an ongoing practice-based research network of family medicine practices that were purposively sampled to represent the geographic (urban and rural) and ethnic diversity of North Carolina. This network cohort consists of individuals who visited a participating practice, are ≥18 years of age, gave consent to participate in the research study, and completed a survey about demographics, health conditions, and health habits (35). It is frequently enriched with new participants (2004, 2005, 2008) and is used as a source population for a variety of additional research studies. The flow of participants originating from the NC-FM-RN into the current study is illustrated in Figure 1.

In 2006, participants who had agreed to be contacted (n = 2,420) were mailed a letter inviting participation in a followup telephone survey for the Individual and Community Social Determinants of Arthritis Outcomes Study (SODE). Individuals were eligible to participate in this study if they were ≥18 years old, spoke English fluently, and had current contact information (address and telephone number). There was a 65.2% participation rate (n = 1,541). This followup telephone survey assessed demographics, health status, chronic health conditions, health attitudes and beliefs, health behaviors, and perceptions of neighborhood environment, and it provides the data for the current study.

Arthritis status was determined using the 2002 arthritis module of the Behavioral Risk Factor Surveillance System definition of self-reported doctor diagnosis of arthritis. Participants were classified as self-reporting arthritis if they reported any type of doctor-diagnosed arthritis, including osteoarthritis, RA, or fibromyalgia; all measures



**Figure 1.** Participant recruitment and participation. NC-FM-RN = North Carolina Family Medicine Research Network; SODE = Individual and Community Social Determinants of Arthritis Outcomes Study; $T_1$ = time 1; $T_2$ = time 2.

were self-reported and questions were closed ended. Previous research has indicated that this measure is highly reliable in general populations for providing arthritis prevalence estimates, particularly in older populations (36,37). In this study, a total of 937 participants self-reported ≥1 types of arthritis or rheumatic conditions: osteoarthritis (n = 484), fibromyalgia (n = 118), RA (n = 219), bursitis or tendonitis (n = 439), carpal tunnel syndrome (n = 200), gout (n = 135), or another arthritis condition (n = 111). These respondents were similar, when compared with the initial NC-FM-RN cohort in 2001, in race (76% white versus 76%) and sex (73% women versus 71%). However, they were more likely to have greater levels of education in the 2006 survey (56% some college or more versus 50%). Finally, after adjustment for age in 2001, this sample was older (24% age ≥65 years versus 18%); this is to be expected as it is reflective of those who visit family practices, as well as an arthritis-only sample. All study materials and methods were approved by the University of North Carolina Biomedical Institutional Review Board.

**Health status outcomes.** Health status outcomes were assessed using the following 4 established measures.

*Physical and mental health functioning.* The 2 summary scores of the Medical Outcomes Study Short Form 12 health survey version 2 (SF-12 v. 2), the SF-12 v. 2 physical component summary (PCS) and the SF-12 v. 2 mental

component summary (MCS), were used to assess physical and mental health functioning. The SF-12 v. 2 is strongly correlated with the Short Form 36 health survey and is reliable in general populations (38). In the current study, it had high internal consistency (Chronbach's $\alpha$ = 0.90). PCS and MCS scores range from 0 to 100, with higher scores indicating better health; both the PCS and MCS were used as continuous variables in this study.

*Health Assessment Questionnaire (HAQ).* Self-reported function was assessed using the disability scale of the HAQ (39), which includes questions about 20 activities of daily living organized by 8 domains (dressing, arising, eating, walking, hygiene, activities, reach, and grip); scores are adjusted based on the use of assistive devices. Each domain is separately scored, with the total score averaged over the 8 domains. Each item is scored from 0 to 3, where 0 = no disability and 3 = maximum disability; therefore, a higher score represents greater disability.

*Depressive symptoms.* The Center for Epidemiologic Studies Depression Scale (CES-D) measures symptoms associated with depression in the general population (40) and is a 20-item self-report scale yielding scores ranging from 0 to 60, with higher scores indicating greater levels of depressive symptoms. A score of ≥16 has been determined to be a clinically relevant marker of depressive symptoms (41). However, others have suggested using higher cut points for greater sensitivity and specificity (42). In this current study, we estimate the prevalence of depression and anxiety from a single self-report question to be 33% (n = 1,541) and 37% in the sample of arthritis-only individuals (n = 937). Given this high prevalence of self-reported depression and anxiety, CES-D scores were dichotomized at a cut point of 16 (<16 or ≥16) in this study. This scale had high internal consistency in this study (Chronbach's $\alpha$ = 0.92).

**Main predictors: perceived neighborhood characteristics.** During the telephone survey, participants were asked to think about the area of within 1 mile of their home and report on 4 perceived neighborhood characteristics: aesthetic environment (7 items), walking/exercise environment (11 items), safety (3 items), and social cohesion (5 items) using a 5-point Likert-response format with response categories ranging from 1 to 5, where 1 = strongly agree and 5 = strongly disagree. Reverse coding was conducted for certain items to standardize the direction of all items. For each scale, responses were summed for each item, and averaged to create an overall scale score that ranged from 1 to 5. For example, a score of 1 would indicate better perception of neighborhood aesthetics and a score of 5 would indicate worse perception of aesthetics. Aesthetic environment, walking environment, and safety scales were developed by Echeverria et al (3) specifically to examine cardiovascular health outcomes; the social cohesion and trust scale was developed by Sampson and colleagues (43). For clarity and simplicity, these perceived neighborhood characteristics will be referred to as aesthetics, walkability, safety, and social cohesion, respectively. We chose these 4 perceived neighborhood scales because all have previously been determined to be reliable in a sample of participants with cardiovascular disease (3), and

Case 3:16-cv-00381-JCH Document 1-1 Filed 03/07/16 Page 23 of 75

we believed these domains may influence physical and mental health outcomes in this sample of participants with arthritis. Items within each neighborhood dimension had good internal consistency in this study (Cronbach's $\alpha$ values were 0.80 for aesthetics, 0.79 for walking, 0.78 for safety, and 0.81 for social cohesion). See Appendix A for each scale, related items, and those items reverse scored.

**Covariates.** In this study, covariates included participant sociodemographics (age, race, and sex), health characteristics (body mass index [BMI] and number of comorbid conditions), individual SES measures (education, household income, occupation, and home ownership), and neighborhood SES (block group poverty rate).

Age was calculated using the participant's self-reported date of birth and the date of the telephone survey and was used as a continuous measure. Race was self-reported and based on the 2000 US Census race and ethnicity categories and trichotomized into non-Hispanic white, non-Hispanic black, and other, where other includes individuals self-reporting Latino/Hispanic ethnicity or >1 race (American Indian/Alaska Native, Asian, Black or African American, Native Hawaiian or Other Pacific Islander, White, and Other). BMI ($kg/m^2$) was calculated from self-reported height and weight and used as a continuous measure. Existing comorbid conditions were assessed by asking participants whether a health professional had ever told them that they had any of 21 different chronic diseases (e.g., diabetes mellitus, heart disease, and vision problems). For this paper, the number of comorbid conditions is a sum of all self-reported conditions, excluding back pain, osteoporosis, psoriasis, high blood pressure, high cholesterol, and depression/anxiety. These conditions were excluded either for their association with arthritis and the health outcomes of interest or because they tend to be asymptomatic.

Because of the close association between individual SES and neighborhood SES, a number of individual-level SES measures were included in the models as covariates. Education was assessed with 7 categories and later dichotomized as a high school education or less and education beyond high school. Household income was queried using a stepped approach, with participants answering "Is your annual family income above or below \$45,000"; this dichotomy was retained for this study. Occupation was queried as open text, coded using the 2000 US Census occupation classification categories, and further refined into professional (e.g., management, technical, sales, and office) and nonprofessional (e.g., farming, fishing, service, construction, production, and labor) categories for use in this study. Home ownership (yes, no) was assessed by asking participants "Do you own your own home?"

Finally, an objective neighborhood SES indicator was assessed. Each participant's household was geocoded and linked to a US Census 2000 block group, with each participant assigned a block group poverty rate (percentage of households with income below the poverty line). This variable was used as a continuous variable, with higher rates indicating greater neighborhood poverty.

**Statistical analysis.** Because these perceived neighborhood scales were created for use among the general population, we conducted factor analysis on the scale items, fitting a 4-factor solution with an oblique rotation (assuming correlation between the items) from all participants (n = 1,541). The scales performed similarly among those with and without self-reported arthritis, indicating no difference by arthritis status in the way that individuals interpret and respond to the perceived neighborhood questions. Statistical analyses were conducted on 696 participants who self-reported arthritis (after excluding missing cases on covariates and the main perceived neighborhood environment predictors) using Stata, version 11.0 (Stata-Corp). Univariate analyses were conducted as well as correlation and bivariate analyses to examine unadjusted and adjusted associations between SES variables, perceived neighborhood characteristics, and health status outcomes. Separate multivariate linear regressions were used for physical functioning and mental health, and multivariate logistic regression analysis was used for depressive symptoms. For each health status outcome, separate regression models were conducted to examine perceived physical environment (aesthetics and walkability) and perceived social environment (safety and social cohesion), and were adjusted for age, sex, BMI, number of comorbid conditions, race, education, homeownership, occupation, income, and block group poverty rate. Finally, for each health status outcome a full model included all 4 perceived neighborhood characteristics as main predictors and adjusted for age, sex, BMI, number of comorbid conditions, race, education, homeownership, occupation, income, and block group poverty rate.

## RESULTS

The 696 participants with arthritis were on average 60 years old and had a mean BMI of 30 $kg/m^2$. They tended to be women (73%), white (77%), and educated (56% some college or higher), with a median income of \$45,000 (51% below) and employment in occupations considered professional (59%) (Table 1). Participants had mean scores of 38.74 and 51.44 for physical functioning and mental health status, respectively, and generally reported low disability (mean score 0.67). The majority of participants (70%) self-reported depressive symptoms scores of <16 (Table 1).

Preliminary analyses examined for potential effect modification of race and sex for the 4 perceived neighborhood characteristic variables on each outcome. No interaction terms were significant at $P < 0.01$ after adjusting for the criterion level using a Bonferroni correction for multiple tests, and all likelihood ratio tests were statistically insignificant. Correlation analyses (not shown) indicated that the perceived neighborhood scales were moderately correlated with one another (ranging from 0.4 to 0.6; $P < 0.001$), indicating a shared variance. Low correlation (ranging from 0.2 to 0.3; $P < 0.001$) was also observed for the relationship between each perceived neighborhood characteristic and health status outcome. Bivariate analyses revealed that lower individual-level income, less educa-

*Martin et al*

| Table 1. Participant sociodemographic characteristics, neighborhood characteristics, and outcomes (n = 696)* | | |
|---|---|---|
| | **Value** | **Range** |
| Sociodemographic characteristics | | |
| Age, years | 60.41 ± 12.69 | 23–94 |
| BMI, kg/m² | 29.9 ± 6.8 | 15–64 |
| Comorbid condition count | 3 ± 2 | 0–11 |
| Income <$45,000, % | 51 | |
| Race, % | | |
| Non-Hispanic white | 77 | |
| Non-Hispanic black | 16 | |
| Other | 7 | |
| Women, % | 73 | |
| High school education or less, % | 44 | |
| Homeowner, % | 84 | |
| Professional occupation, % | 59 | |
| Perceived neighborhood characteristics | | |
| Aesthetics (1–5) | 2.23 ± 0.69 | 1–5 |
| Walkability (1–5) | 2.70 ± 0.67 | 1–5 |
| Safety (1–5) | 2.26 ± 0.86 | 1–5 |
| Social cohesion (1–5) | 2.27 ± 0.72 | 1–5 |
| Objective neighborhood | | |
| Block group poverty level | 12.55 ± 8.72 | 0–51.37 |
| Health status outcomes† | | |
| Physical functioning, SF-12 v. 2 PCS score (0–100) | 38.74 ± 12.86 | 5.68–61.57 |
| Mental health, SF-12 v. 2 MCS score (0–100) | 51.44 ± 11.08 | 8.99–75.24 |
| Disability, HAQ score (0–3) | 0.67 ± 0.64 | 0–3 |
| Depressive symptoms by CES-D score, % | | |
| Score <16 | 70 | |
| Score ≥16 | 30 | |

* Values are the mean ± SD unless otherwise indicated. BMI = body mass index; SF-12 v. 2 = Short Form 12 version 2; PCS = physical component summary; MCS = mental component summary; HAQ = Health Assessment Questionnaire; CES-D = Center for Epidemiologic Studies Depression Scale.
† Number of participants varies for outcomes: for PCS and MCS scores, n = 689, for the HAQ, n = 696, and for the CES-D, n = 669.

tion, nonhomeownership, and nonprofessional occupations were significantly associated with worse perception of neighborhood aesthetics, walkability, safety, and social cohesion (with the exception of perceived walkability and homeownership; $P = 0.547$). Examination of block group poverty as an objective measure of community SES showed a modest correlation between aesthetics (r = 0.18; $P < 0.001$), walkability (r = 0.07; $P = 0.055$), safety (r = 0.17; $P < 0.001$), and social cohesion (r = 0.12; $P = 0.001$) (Table 2).

The neighborhood perceptions were measured on a scale of 1–5, with increasing numerical value implying worsening perceptions. In the following presentation of the regression results, all allusions to worse or lower perception will refer to a 1-unit increase in the perception scale. Regression analyses examining the bivariate relationship (not shown) between each perceived neighborhood characteristic and each health status outcome revealed strong relationships; unadjusted models indicated that each perceived neighborhood characteristic was statistically significant ($P < 0.001$) for each health status outcome. These relationships remain, although slightly attenuated ($P \leq 0.001$ to $P = 0.017$), in separate models adjusting for age, sex, BMI, number of comorbid conditions, race, and individual and neighborhood SES covariates (Table 3). A 1-unit increase (worsening) of neighbor-

hood aesthetics, walkability, or social cohesion resulted in a nearly 2-point decline in physical functioning, and a 1-unit increase of neighborhood aesthetics, safety, or social cohesion also resulted in an average decline of 2 points on mental health functioning. Disability scores were higher for those perceiving worse neighborhood characteristics. A 1-unit increase in perceived neighborhood aesthetics resulted in odds 1.79 times higher of reporting greater depressive symptoms (95% confidence interval [95% CI] 1.34–2.38, $P < 0.001$). A 1-unit increase in perceived neighborhood walkability (odds ratio [OR] 1.59, 95% CI 1.19–2.12; $P = 0.002$), safety (OR 1.68, 95% CI 1.35–2.10; $P < 0.001$), or social cohesion (OR 1.84, 95% CI 1.42–2.40; $P < 0.001$) also increased the odds of self-reporting greater depressive symptoms.

Multivariate regression and multivariate logistic regression analyses examining the association between all 4 perceived neighborhood characteristics and health status outcomes are reported in Table 4. No statistically significant association existed between perceived neighborhood characteristics and physical functioning after adjusting for individual-level covariates and objective neighborhood SES. Perceiving worse neighborhood aesthetics and lower social cohesion were associated with a trend for greater disability. Individuals perceiving worse neighborhood aesthetics scored nearly 2 points lower on mental health,

**Table 2.** Bivariate analysis of individual- and community-level SES and perceived neighborhood characteristic scores*

|  | Aesthetics | Walkability | Safety | Social cohesion |
|---|---|---|---|---|
| Individual SES measures† | | | | |
| Income | | | | |
| ≥$45,000 | 2.04 ± 0.65 | 2.56 ± 0.66 | 2.04 ± 0.78 | 2.11 ± 0.65 |
| <$45,000 | 2.40 ± 0.68 | 2.83 ± 0.63 | 2.49 ± 0.88 | 2.43 ± 0.74 |
| *P* | < 0.001 | < 0.001 | < 0.001 | < 0.001 |
| Education | | | | |
| Beyond high school | 2.13 ± 0.74 | 2.65 ± 0.72 | 2.20 ± 0.88 | 2.23 ± 0.75 |
| High school or less | 2.37 ± 0.60 | 2.78 ± 0.57 | 2.38 ± 0.84 | 2.36 ± 0.68 |
| *P* | < 0.001 | 0.008 | 0.010 | 0.011 |
| Occupation | | | | |
| Professional | 2.12 ± 0.70 | 2.65 ± 0.71 | 2.20 ± 0.84 | 2.19 ± 0.70 |
| Nonprofessional | 2.40 ± 0.64 | 2.79 ± 0.58 | 2.39 ± 0.89 | 2.42 ± 0.73 |
| *P* | < 0.001 | 0.006 | 0.005 | < 0.001 |
| Homeowner | | | | |
| Yes | 2.19 ± 0.70 | 2.70 ± 0.67 | 2.25 ± 0.88 | 2.24 ± 0.72 |
| No | 2.42 ± 0.64 | 2.74 ± 0.62 | 2.46 ± 0.79 | 2.52 ± 0.70 |
| *P* | 0.002 | 0.547 | 0.015 | < 0.001 |
| Community SES measure‡ | | | | |
| Block group poverty, r | 0.18 | 0.07 | 0.17 | 0.12 |
| *P* | < 0.001 | 0.055 | < 0.001 | 0.001 |

* Values are the mean ± SD unless otherwise indicated. Higher values of neighborhood characteristics indicate worse perception. SES = socioeconomic status.
† By *t*-test.
‡ By correlation.

even after adjusting for covariates ($B = -1.81$, $P = 0.034$). A trend for scoring 1.25 points lower on mental health was observed for individuals reporting lower perceived neighborhood social cohesion ($B = -1.25$, $P = 0.077$). Individuals had 1.36-times greater odds of reporting depressive symptoms if they perceived lower neighborhood safety (95% CI 1.04–1.78, $P = 0.023$) and 1.42-times greater odds of reporting depressive symptoms if they perceived lower neighborhood social cohesion (95% CI 1.03–1.96, $P = 0.030$). A trend was observed for individuals perceiving worse neighborhood aesthetics and lower neighborhood social cohesion to score nearly one-tenth of a point higher on the disability scale ($B = 0.09$, $P = 0.052$ and $B = 0.06$, $P = 0.084$, respectively). Considering statistically significant covariates in general, poorer outcomes were related to being older and having a higher BMI, a greater number of comorbid conditions, and less education and income.

## DISCUSSION

Our study revealed that different perceived neighborhood characteristics emerged as significant factors for physical and mental health outcomes in this sample of individuals with arthritis. Although nearly all perceived neighborhood characteristics were statistically significant predictors in separate models, these relationships did not remain in the full model with all 4 perceived neighborhood characteristics, reflecting the shared variance among the 4 perceived neighborhood characteristics to predict health outcomes. Perceiving worse neighborhood aesthetics was independently associated with scoring nearly 2 points lower on mental health, as well as indicating a trend for having a higher disability score ($B = 0.09$, $P = 0.052$). Individuals who perceived lower neighborhood safety and social cohesion had increased odds of reporting depressive symp-

**Table 3.** Adjusted parameter estimates (*B*), SEs, and ORs (95% CIs) for perceived neighborhood physical environment and social environment and health status outcome*

| Model | Physical functioning, *B* (SE) (n = 689) | Disability, *B* (SE) (n = 696) | Mental health, *B* (SE) (n = 689) | Depressive symptoms, OR (95% CI) (n = 669) |
|---|---|---|---|---|
| 1. Aesthetics | −2.43 (0.63)† | 0.15 (0.30)† | −2.54 (0.61)† | 1.79 (1.34–2.38)† |
| 2. Walkability | −2.41 (0.65)† | 0.12 (0.03)† | −1.22 (0.63)‡ | 1.59 (1.19–2.12)§ |
| 3. Safety | −1.19 (0.50)¶ | 0.09 (0.03)† | −1.88 (0.48)† | 1.68 (1.35–2.10)† |
| 4. Social cohesion | −1.92 (0.59)§ | 0.13 (0.03)† | −2.32 (0.57)† | 1.84 (1.42–2.40)† |

* Models adjust for age, sex, body mass index, number of comorbid conditions, race, education, homeownership, occupation, income, and block group poverty. OR = odds ratio; 95% CI = 95% confidence interval.
† $P \leq 0.001$.
‡ $P < 0.10$.
§ $P \leq 0.01$.
¶ $P < 0.05$.

*Martin et al*

| Table 4. Perceived neighborhood environment, SES variables, and health status outcomes* | | | | |
|---|---|---|---|---|
| | Physical functioning, $B$ (SE) (n = 689) | Disability, $B$ (SE) (n = 696) | Mental health, $B$ (SE) (n = 689) | Depressive symptoms, OR (95% CI) (n = 669) |
| Aesthetics | −1.25 (0.89) | 0.09 (0.04)† | −1.81 (0.85)‡ | 1.20 (0.81–1.77) |
| Walkability | −1.29 (0.83) | 0.02 (0.04) | 1.04 (0.80) | 1.03 (0.71–1.49) |
| Safety | 0.11 (0.61) | 0.03 (0.03) | −0.95 (0.59) | 1.36 (1.04–1.78)‡ |
| Social cohesion | −1.29 (0.73) | 0.06 (0.04)† | −1.25 (0.71)† | 1.42 (1.03–1.96)‡ |
| High school or below | 2.76 (0.95)§ | −0.07 (0.05) | 0.97 (0.91) | 0.57 (0.38–0.89)§ |
| Homeowner | 0.031 (1.18) | −0.04 (0.06) | −0.93 (1.13) | 1.05 (0.65–1.73) |
| Professional occupation | · 1.15 (0.99) | −0.05 (0.05) | 0.78 (0.95) | 0.75 (0.49–1.16) |
| <$45,000 household income | −2.66 (1.02)§ | 0.17 (0.05)¶ | −2.77 (0.98)§ | 2.26 (1.42–3.59)¶ |
| Block group poverty level | 0.04 (0.05) | −0.002 (0.01) | 0.06 (0.05) | 1.00 (0.98–1.02) |

* Models adjusted for age, sex, race, body mass index, and number of comorbid conditions. SES = socioeconomic status; OR = odds ratio; 95% CI = 95% confidence interval.
† $P < 0.10$.
‡ $P < 0.05$.
§ $P < 0.01$.
¶ $P ≤ 0.001$.

toms by 1.36 and 1.42 times, respectively. There was also a trend for those who perceived worse neighborhood social cohesion to have a lower mental health score ($B = −1.25$, $P = 0.077$) and a higher disability score ($B = 0.06$, $P = 0.084$). Finally, analyses (not shown) examining the CES-D at a cut point of 23 (<23, ≥23) revealed that both the strength and significance of perceived neighborhood safety and perceived social cohesion are attenuated to OR 1.31, $P = 0.080$ and OR 1.41, $P = 0.062$, respectively, indicating a continued trend that neighborhood perceptions may play an important role in major clinical depression beyond individual-level characteristics.

Although there is no clear pattern of one or more perceived neighborhood characteristics definitively emerging as predictive of the physical and mental health outcomes examined in this study, perceived aesthetics, safety, and social cohesion do emerge as neighborhood characteristics worthy of additional attention in future studies conducted in an arthritis population. Although findings from studies examining perceived neighborhood environment problems and mental health outcomes have been mixed (7), our study findings are in line with several studies (44–46), including a recent study by Mair et al (30). They found that perception of poor aesthetics, greater violence, and lower social cohesion were associated with greater depressive symptoms (measured with the CES-D) in cross-sectional analyses of a large, population-based cohort study of healthy adults ages 45–84 years (30). These findings, combined with our own in an arthritis-only population, suggest that perceived neighborhood aesthetics, safety, and social cohesion do play a role in health outcomes, particularly mental health, even when controlling for individual- and neighborhood-level SES variables.

The current study is unique in examining and confirming that these associations exist among individuals with arthritis residing in largely rural areas of North Carolina, a population in which these instruments have not previously been used. Prior studies have generally examined perceived neighborhood environment in more urban areas such as London, UK (25); Adelaide, Australia (47); Balti-

more, Maryland; New York, New York; St. Paul, Minnesota; Forsyth County, North Carolina; and Cook County, Illinois (the second most populous county in the US after Los Angeles county) (32). Additionally, previous research indicates that individual-level SES plays a significant role in physical and mental health outcomes among individuals with arthritis, low income, and low education, placing individuals at greater risk for poorer health outcomes. Given that neighborhood perceptions (aesthetics, safety, and social cohesion) continue to play a significant role in health outcomes, above and beyond individual-level (e.g., higher income and education) and neighborhood-level SES, we conclude that the role of perceived neighborhood environment is an important predictor of physical and mental health. Findings from this research suggest that future researchers should consider the importance of the perceived neighborhood environment (aesthetics, safety, and social cohesion) when examining the influence of place on health, particularly mental health, in individuals with arthritis.

Several limitations should be noted, however. This study was cross-sectional and therefore we cannot assert a causal relationship between perceived neighborhood environment and health status outcomes. Additionally, we do not have data on participants' length of residence. Knowledge of how long participants had lived in their particular home and neighborhood would have allowed for adjustment of potential confounders, such as the effect of having established social connections within the neighborhood or being witness to neighborhood environment change over time (i.e., from either good to bad or bad to good).

Previous research has warned of same-source bias when examining the relationship between individual perceptions and individual health outcomes, indicating that other characteristics may influence one's perception (3). Because our study aimed to examine whether individual perception of neighborhood environment influenced health outcomes for individuals with arthritis, we obtained both perceived neighborhood characteristics and

health status outcomes from the same group of individuals. We cannot adjust for the possibility that those with lower mental health at the time of the survey have biased neighborhood perceptions given the cross-sectional nature of our study, although we were able to adjust for physical health (count of comorbid conditions), a theorized cofounder. Additionally, the 937 participants who self-reported arthritis represent 480 block groups (63 individuals not assigned a block group, and 293 individuals who are the sole representative for their block group). The remaining 581 participants represent 187 block groups, and the intraclass (or intraneighborhood) correlation coefficient (ICC) reveals very little agreement in the scale scores between block groups for each perceived neighborhood: aesthetics ICC 0.079, walkability ICC 0.180, safety ICC 0.089, social cohesion ICC <0.001). We believe that the low ICC is a function of nearly 94% of the block groups containing <5 individuals (range 2–12).

In conclusion, our study findings indicate that perceived neighborhood environment, especially the characteristics of aesthetics, safety, and social cohesion, was predictive of health outcomes in this sample of adults with self-reported arthritis, even after adjusting for key variables. Strong feelings of connections and cohesion between neighbors may increase feelings of safety and security in their neighborhood environment, in turn positively influencing mental health. Conversely, the lack of positive social interactions and poor perceptions of the neighborhood environment may operate in such a way as to negatively influence mental health. Future studies interested in examining the role that community characteristics play on disability and mental health in individuals with arthritis might consider further examination of perceived neighborhood with constructs of social capital, particularly social cohesion and safety. Additional evidence from prospective studies with community-dwelling adults, especially those from nonurban areas, is needed to shed light on the causal relationship between perceived neighborhood environment and health outcomes.

## ACKNOWLEDGMENTS

The authors thank the following participating family practices in the NC-FM-RN for their assistance: Black River Health Services, Burgaw; Bladen Medical Associates, Elizabethtown; Blair Family Medicine, Wallace; Cabarrus Family Medicine, Concord; Cabarrus Family Medicine, Harrisburg; Cabarrus Family Medicine, Kannapolis; Cabarrus Family Medicine, Mt. Pleasant; Chatham Primary Care, Siler City; Carolinas Medical Center Biddle Point, Charlotte; Carolinas Medical Center North Park, Charlotte; Community Family Practice, Asheville; Cornerstone Medical Center, Burlington; Dayspring Family Medicine, Eden; Family Practice of Summerfield, Summerfield; Goldsboro Family Physicians, Goldsboro; Henderson Family Health Center, Henderson; Orange Family Medical Group, Hillsborough; Person Family Medical Center, Roxboro; Pittsboro Family Medicine, Pittsboro; Prospect Hill Community Health Center, Prospect Hill; Robbins Family Practice, Robbins; and Village Family Medicine, Chapel Hill. Finally, we thank the individuals who willingly participated in the study.

## AUTHOR CONTRIBUTIONS

All authors were involved in drafting the article or revising it critically for important intellectual content, and all authors approved the final version to be submitted for publication. Dr. Callahan had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.

**Study conception and design.** Callahan.

**Acquisition of data.** Martin, Schoster, Callahan.

**Analysis and interpretation of data.** Martin, Shreffler, Callahan.

## REFERENCES

1. Centers for Disease Control and Prevention (CDC). Racial/ethnic differences in the prevalence and impact of doctor-diagnosed arthritis: United States, 2002. MMWR Morb Mortal Wkly Rep 2005;54:119–23.
2. Jordan JM, Lawrence R, Kington R, Fraser P, Karlson E, Lorig K, et al. Ethnic health disparities in arthritis and musculoskeletal diseases: report of a scientific conference. Arthritis Rheum 2002;46:2280–6.
3. Echeverria SE, Diez-Roux AV, Link BG. Reliability of self-reported neighborhood characteristics. J Urban Health 2004; 81:682–701.
4. Mujahid MS, Diez Roux AV, Morenoff JD, Raghunathan T. Assessing the measurement properties of neighborhood scales: from psychometrics to ecometrics. Am J Epidemiol 2007;165:858–67.
5. Kawachi I, Berkman LF. Neighborhoods and health. New York: Oxford University Press; 2003.
6. Morland K, Wing S, Diez-Roux A. The contextual effect of the local food environment on residents' diets: the atherosclerosis risk in communities study. Am J Public Health 2002;92: 1761–7.
7. Yen IH, Michael YL, Perdue L. Neighborhood environment in studies of health of older adults: a systematic review. Am J Prev Med 2009;37:455–63.
8. Harrison MJ, Tricker KJ, Davies L, Hassell A, Dawes P, Scott DL, et al. The relationship between social deprivation, disease outcome measures, and response to treatment in patients with stable, long-standing rheumatoid arthritis. J Rheumatol 2005; 32:2330–6.
9. Harrison MJ, Farragher TM, Clarke AM, Manning SC, Bunn DK, Symmons DP. Association of functional outcome with both personal- and area-level socioeconomic inequalities in patients with inflammatory polyarthritis. Arthritis Rheum 2009;61:1297–304.
10. Trupin L, Tonner MC, Yazdany J, Julian LJ, Criswell LA, Katz PP, et al. The role of neighborhood and individual socioeconomic status in outcomes of systemic lupus erythematosus. J Rheumatol 2008;35:1782–8.
11. Callahan LF, Shreffler J, Mielenz T, Schoster B, Kaufman JS, Xiao C, et al. Arthritis in the family practice setting: associations with education and community poverty. Arthritis Rheum 2008;59:1002–8.
12. Callahan LF, Shreffler J, Mielenz T, Kaufman J, Schoster B, Randolph R, et al. Health-related quality of life in adults from 17 family practice clinics in North Carolina. Prev Chronic Dis 2009;6:A05. URL: http://www.cdc.gov/pcd/issues/2009/jan/07_0215.htm.
13. Clark CR, Kawachi I, Ryan L, Ertel K, Fay ME, Berkman LF. Perceived neighborhood safety and incident mobility disability among elders: the hazards of poverty. BMC Public Health 2009;9:162.
14. Troped PJ, Saunders RP, Pate RR, Reininger B, Ureda JR, Thompson SJ. Associations between self-reported and objective physical environmental factors and use of a community rail-trail. Prev Med 2001;32:191–200.

15. Kirtland KA, Porter DE, Addy CL, Neet MJ, Williams JE, Sharpe PA, et al. Environmental measures of physical activity supports: perception versus reality. Am J Prev Med 2003;24: 323–31.

16. Wen M, Hawkley LC, Cacioppo JT. Objective and perceived neighborhood environment, individual SES and psychosocial factors, and self-rated health: an analysis of older adults in Cook County, Illinois. Soc Sci Med 2006;63:2575–90.

17. Bowling A, Stafford M. How do objective and subjective assessments of neighbourhood influence social and physical functioning in older age? Findings from a British survey of ageing. Soc Sci Med 2007;64:2533–49.

18. Wilson K, Elliott S, Law M, Eyles J, Jerrett M, Keller-Olaman S. Linking perceptions of neighbourhood to health in Hamilton, Canada. J Epidemiol Community Health 2004;58:192–8.

19. Diez Roux AV. Investigating neighborhood and area effects on health. Am J Public Health 2001;91:1783–9.

20. Miller DB, Townsend A. Urban hassles as chronic stressors and adolescent mental health: the Urban Hassles Index. Brief Treat Crisis Interv 2005;5:85–94.

21. Yen IH, Yelin EH, Katz P, Eisner MD, Blanc PD. Perceived neighborhood problems and quality of life, physical functioning, and depressive symptoms among adults with asthma. Am J Public Health 2006;96:873–9.

22. Collins PA, Hayes MV, Oliver LN. Neighbourhood quality and self-rated health: a survey of eight suburban neighbourhoods in the Vancouver Census Metropolitan Area. Health Place 2009;15:156–64.

23. Weden MM, Carpiano RM, Robert SA. Subjective and objective neighborhood characteristics and adult health. Soc Sci Med 2008;66:1256–70.

24. Rohrer J, Pierce JR Jr, Denison A. Walkability and self-rated health in primary care patients. BMC Fam Pract 2004;5:29.

25. Feldman PJ, Steptoe A. How neighborhoods and physical functioning are related: the roles of neighborhood socioeconomic status, perceived neighborhood strain, and individual health risk factors. Ann Behav Med 2004;27:91–9.

26. Kim D. Blues from the neighborhood? Neighborhood characteristics and depression. Epidemiol Rev 2008;30:101–17.

27. Schaefer-McDaniel N. Neighborhood stressors, perceived neighborhood quality, and child mental health in New York City. Health Place 2009;15:148–55.

28. Latkin CA, Curry AD. Stressful neighborhoods and depression: a prospective study of the impact of neighborhood disorder. J Health Soc Behav 2003;44:34–44.

29. Echeverria S, Diez-Roux AV, Shea S, Borrell LN, Jackson S. Associations of neighborhood problems and neighborhood social cohesion with mental health and health behaviors: the Multi-Ethnic Study of Atherosclerosis. Health Place 2008;14: 853–65.

30. Mair C, Diez Roux AV, Shen M, Shea S, Seeman T, Echeverria S, et al. Cross-sectional and longitudinal associations of neighborhood cohesion and stressors with depressive symptoms in the multiethnic study of atherosclerosis. Ann Epidemiol 2009;19:49–57.

31. Bowling A, Barber J, Morris R, Ebrahim S. Do perceptions of

32. Mujahid MS, Diez Roux AV, Morenoff JD, Raghunathan TE, Cooper RS, Ni H, et al. Neighborhood characteristics and hypertension. Epidemiology 2008;19:590–8.

33. Yen IH, Yelin E, Katz P, Eisner MD, Blanc PD. Impact of perceived neighborhood problems on change in asthma-related health outcomes between baseline and follow-up. Health Place 2008;14:468–77.

34. Gary TL, Safford MM, Gerzoff RB, Ettner SL, Karter AJ, Beckles GL, et al. Perception of neighborhood problems, health behaviors, and diabetes outcomes among adults with diabetes in managed care: the Translating Research Into Action for Diabetes (TRIAD) study. Diabetes Care 2008;31:273–8.

35. Sloane PD, Callahan L, Kahwati L, Mitchell CM. Development of a practice-based patient cohort for primary care research. Fam Med 2006;38:50–7.

36. Sacks JJ, Harrold LR, Helmick CG, Gurwitz JH, Emani S, Yood RA. Validation of a surveillance case definition for arthritis. J Rheumatol 2005;32:340–7.

37. Bombard JM, Powell KE, Martin LM, Helmick CG, Wilson WH. Validity and reliability of self-reported arthritis: Georgia senior centers, 2000–2001. Am J Prev Med 2005;28:251–8.

38. Ware J Jr, Kosinski M, Keller SD. A 12-item short-form health survey: construction of scales and preliminary tests of reliability and validity. Med Care 1996;34:220–33.

39. Fries JF, Spitz PW, Young DY. The dimensions of health outcomes: the health assessment questionnaire, disability and pain scales. J Rheumatol 1982;9:789–93.

40. Radloff LS. The CES-D scale: a self-report depression scale for research in the general population. Appl Psychol Meas 1977; 1:385–401.

41. Boyd JH, Weissman MM, Thompson WD, Myers JK. Screening for depression in a community sample: understanding the discrepancies between depression symptom and diagnostic scales. Arch Gen Psychiatry 1982;39:1195–200.

42. McDowell I. Measuring health: a guide to rating scales and questionnaires. 3rd ed. Oxford (UK): Oxford University Press; 2006.

43. Sampson RJ, Raudenbush SW, Earls F. Neighborhoods and violent crime: a multilevel study of collective efficacy. Science 1997;277:918–24.

44. Ziersch AM, Baum FE, Macdougall C, Putland C. Neighbourhood life and social capital: the implications for health. Soc Sci Med 2005;60:71–86.

45. Mair C, Diez Roux AV, Galea S. Are neighbourhood characteristics associated with depressive symptoms? A review of evidence. J Epidemiol Community Health 2008;62:940–6.

46. Leslie E, Cerin E. Are perceptions of the local environment related to neighbourhood satisfaction and mental health in adults? Prev Med 2008;47:273–8.

47. Baum FE, Ziersch AM, Zhang G, Osborne K. Do perceived neighbourhood cohesion and safety contribute to neighbourhood differences in health? Health Place 2009;15:925–34.

---

### APPENDIX A. PERCEIVED PHYSICAL AND SOCIAL NEIGHBORHOOD ENVIRONMENT ITEMS*

Aesthetic environment
    1. My neighborhood is attractive
    2. There is a lot of trash and litter on the street in my neighborhood†
    3. There are interesting things to do in my neighborhood
    4. There is enjoyable scenery in my neighborhood
    5. There is a lot of noise in my neighborhood†
    6. In my neighborhood the buildings and homes are well maintained
    7. The buildings and houses in my neighborhood are interesting

Walking/exercise environment
    1. My neighborhood offers many opportunities to be physically active
    2. Local sports clubs and other providers in my neighborhood offer many opportunities to
       get exercise
    3. It is pleasant to walk in my neighborhood
    4. There are enough trees in my neighborhood to provide shade
    5. My neighborhood has heavy traffic†
    6. There are busy roads to cross when out for walks in my neighborhood†
    7. In my neighborhood it is easy to walk to places
    8. There are stores within walking distance of my home
    9. In my neighborhood, the streets and sidewalks are in good condition
    10. I often see other people walking in my neighborhood
    11. I often see other people exercise (e.g., jog) in my neighborhood

Safety from crime
    1. I feel safe walking in my neighborhood during the evening
    2. My neighborhood is safe from crime
    3. Violence is a problem in my neighborhood†

Social cohesion
    1. People around here are willing to help their neighbors
    2. This is a close-knit or unified neighborhood
    3. People in this neighborhood can be trusted
    4. People in this neighborhood generally don't get along with each other†
    5. People in this neighborhood do not share the same values†

* Response categories were: strongly agree, agree, do not agree or disagree, disagree, strongly disagree.
† Reverse-coded.

Journal of Architectural and Planning Research
27:2 (Summer, 2010)                124

# ENVIRONMENTS AND HEALTH: PLANNING DECISIONS AS PUBLIC-HEALTH DECISIONS

*Nancy M. Wells*

*Gary W. Evans*

*Yizhao Yang*

*Although planning decisions have profound public-health implications, planning-health linkages have received relatively little attention in recent decades. Moreover, on the few occasions when such connections have been made, health outcomes have been narrowly construed, ignoring a wide array of well-documented linkages between the physical environment and human health. Planning decisions directly influence the character and quality of housing and neighborhoods including the external density of communities, the presence and size of parks, air and water quality, land-use mix, the height and size of residential structures, transit-mode mix, traffic density, retail-store location, road geometry, and community noise levels. Environmental characteristics of home and neighborhood, in turn, directly or indirectly affect physical health and psychological well-being. This paper presents a framework for considering the impact of planning decisions on a wide range of health issues. Empirical data from medical and social sciences illustrate connections between health outcomes among residents and residential-environment characteristics influenced by planning. This paper presents a critical summary of the current knowledge and the quality of the evidence. Where appropriate, we also note theoretically plausible leverage points where planning decisions may affect health, but which require further research to test their effects on health-related outcomes.*

Copyright © 2010, Locke Science Publishing Company, Inc.
Chicago, IL, USA                    All Rights Reserved

Journal of Architectural and Planning Research
27:2 (Summer, 2010)                 125

## INTRODUCTION

"The proposed project will bring jobs, bolster the local economy, and be an asset to this community," the developer explains. It's Tuesday, 9:20 p.m., and members of the town planning committee are considering the seventh item of business at the monthly meeting. The developer has done her due diligence, presenting her environmental-impact statement and an economically based argument for the acceptance of her proposal. A community member raises his hand:

*How will this affect our health? How will it influence the health of our children today and decades from now? It's time we start being more proactive and thinking about the positive or negative effects that our decisions may have on the health and well-being of current and future generations. Although some members of this community may reap immediate, short-term financial gains by the proposed plan, I think the developer's analysis is fundamentally flawed. We need to be proactive, make evidence-based decisions, and recognize that low-income families are going to bear a disproportionate share of the adverse health impacts of this proposal. There are relevant research data out there. Let's use it to ensure a better quality of life for all members of the community, rich and poor, for the present and for generations to come.*

### *Planning and Health: A Brief Historical Perspective*

The idea that planning theory and practice have potentially critical effects on human health and welfare is not new. During the industrialization of the 1800s and 1900s, epidemics of infectious diseases such as cholera, typhus, and tuberculosis were associated with poor housing conditions and led to sanitation reform efforts (Rosen, 1958) and, in the mid-1800s, passage of the New York Metropolitan Health Bill and the New York Tenement House Law. In the 1900s, the Progressive Era housing reformers worked to eliminate the dark, filthy, crowded conditions in housing tenements, relying on linkages with disease to make their case (Frank, *et al.*, 2003; Frumkin, *et al.*, 2004).

The efforts of Progressive Era reformers laid a foundation for zoning and focused on reducing congestion in the early 20th century (Frank, *et al.*, 2003; Sloane, 2006). Interest in decentralization, motivated in part by concern for the population's physical health and well-being, led to zoning used to segregate housing types, set parameters for residential lot size, and separate residential, commercial, and industrial uses. In 1926, Village of Euclid, Ohio, v. Ambler Realty Co. established the legitimacy of zoning ordinances based on the notion that zoning was a tool for protecting the health and welfare of citizens (U.S. Supreme Court, 1926).

Given that planners have historically been motivated by concerns about public health, why does the community member's question seem novel? First, the comment is unusual in the contemporary planning context because the explicit connection with public health has not been as salient as economic concerns. Second, the community member raises concerns about potential income disparities in the adverse health impacts of development. Third, the perspective is novel because he proposes a proactive, forward-looking approach to planning-health linkages, while historically the planning field has responded reactively to health crises such as cholera and tuberculosis in the early 1900s. Fourth, his question implies a more inclusive view of health, extending beyond infectious-disease control. Lastly, he suggests the use of health-related research evidence in the decision-making process.

This paper presents evidence that "planning" decisions are often, in effect, "public health" decisions (see Figure 1). We provide an overview of a wide range of environmental characteristics that planning decisions influence and which in turn affect health among both the general population and those at risk for inequities in environmental exposure — particularly low-income and racial minority communities. With evidence from public health, medicine, sociology, psychology, and planning, we illustrate the relevance of planning decisions for health. We then present a new framework for linking planning and healthy housing. We argue that health ought to be an explicit component of planning decision making.

Case 3:16-cv-00381-JCH   Document 1-1   Filed 03/07/16   Page 32 of 75



FIGURE 1.   Schematic overview of planning, the residential environment, and health.

## PLANNING MATTERS

### *Contemporary U.S. Public-Health Issues*

A plethora of health problems face the United States' population today. Approximately 3% of adults aged 18 years and over living in the United States experienced serious psychological distress during the past 30 days (CDC, 2007b). An estimated 4.4 million children aged 4-17 have been diagnosed with attention deficit/hyperactivity disorder (ADHD) (CDC, 2005a). Sixty percent of the United States population is either overweight (36%) or obese (24%) (CDC, 2007a). Approximately 18% of children and adolescents aged 6-19 are overweight (CDC, 2008c). Heart disease and stroke are the leading causes of death in the United States for both women and men, accounting for more than a third of fatalities (CDC, 2008b). The rate of diabetes in the total population is 8%, but among ethnic minority groups, the rates are significantly higher (CDC, 2007c). Approximately 4.3% of persons of all ages experienced an episode of asthma in the past 12 months (CDC, 2007d). Nearly 200,000 people are diagnosed with lung cancer, the deadliest of all cancers, each year (CDC, 2004, 2005b). These public-health challenges range from psychological to physical. What do these diseases and ailments have in common? All are health problems with significant environmental causes (Friis, 2007; Wigle, 2003). Through daily decisions about policy, design, and practice, planners influence community health. Here's how.

### *How and Why Planning Matters*

According to the World Health Organization (WHO) (1946), health is "a state of complete physical, mental and social well-being and not merely the absence of disease or infirmity." The U.S. Department of Health and Human Services' (2001) publication *Healthy People 2010* indicates that "environmental health" comprises

*those aspects of human health, disease, and injury that are determined or influenced by factors in the environment ... not only pathological effects of chemicals [and] biological agents, but also the effects on health of the broad physical and social environment, which includes housing, urban development, land-use and transportation, industry and agriculture.*

Broadly speaking, planning impacts health by affecting the physical, chemical, biological, social, and psychosocial factors in the environment. Specifically, planning's health impacts are transmitted through decisions and actions concerning housing, urban development, land use, and transportation. Planners influence the size of the yards around homes; the configuration of neighborhoods; the number and character of parks and open space in a community; the quality of the air and water; the character, height, and density of housing; and the overall character of our communities. Planning also affects the distribution of environmental quality across neighborhoods, cities, towns, and wider regions. Socioeconomic status (SES) is a powerful shaper of physical and psychological morbidity (Adler, *et al.*, 1993). A primary reason for the strong relation between low SES and compromised health in America is the elevated risk of exposure to cumulative environmental risk factors accompanying low-income living (Evans and Kantrowitz, 2002).

Planning decisions are leverage points — small actions that can translate into big influences. The potency of a decision or a leverage point can be considerable. Planning decisions can both set policies that affect land-use practices county-wide and influence the design, character, or use of a specific lot, neighborhood, or region. We consider four dimensions of the environment — (1) nature and open space, (2) elements of urban form, (3) the food systems, availability, and affordability, and (4) housing characteristics and quality

Case 3:16-cv-00381-JCH   Document 1-1   Filed 03/07/16   Page 33 of 75



FIGURE 2. Nearby nature and urban residents' capacity to cope with poverty: histogram of life functioning score by green versus barren conditions. Adapted from Kuo (2001).

— linking physical manifestations of planning to health outcomes. Rather than exhaustively reviewing the evidence, we summarize what is known or suspected about each dimension and describe the strength of the evidence for each.

### Nature and Open Space

One way planners affect a community's physical environment is through impacting the amount and character of open space. Through the planning process, land can be designated as a city or town park or for development, for example. Similarly, planners help to set rules about the amount of open space required when a new neighborhood is created. Open space is an amenity that community members may appreciate, but it is not typically viewed as a health issue. Yet, there is a growing body of literature suggesting that access to nature or green space has a variety of positive effects on human health (see Frumkin, 2001; Louv, 2005). Furthermore, access to nature and open space is tied to SES. For instance, a poor child living in New York City has access to an average of 17 square yards of park space, compared to the 40 square yards of park space accessible to his middle- and upper-class counterparts (Sherman, 1994).

Frederick Law Olmsted, designer of New York City's Central Park and Boston's "emerald necklace" of parks, was one of the first to articulate the beneficial effects of the natural environment and to advocate for urban open space. Olmsted (1865/1952:21) wrote, "The enjoyment of scenery employs the mind without fatigue and yet exercises it, tranquilizes it and yet enlivens it; and thus, through the influences of the mind over the body gives the effect of refreshing rest and reinvigoration to the whole system." In fact, Olmsted's prescient sentiments have been borne out by research evidence.

Access to or views of the natural environment are linked with cognitive functioning (Kaplan, 1995; Kaplan and Kaplan, 1983). The natural environment helps people recover from cognitive fatigue by capturing involuntary attention (i.e., fascination). Access to nature has been associated with enhanced cognitive functioning among children (Wells, 2000a), backpackers (Hartig, et al., 1991), college students (Tennessen and Cimprich, 1995), girls in Chicago public housing (Faber Taylor, et al., 2002), and low-income urban women (Kuo, 2001). For example, 145 residents of Chicago public housing randomly assigned to architecturally identical buildings with or without nearby trees and grass were compared using measures of functioning and well-being. Residents living in settings lacking vegetation reported more procrastination in dealing with their major life challenges and indicated that their problems were more severe, long-standing, and insoluble. Consistent with prior research on the restorative effects of nature, the underlying explanation for these differences was higher levels of cognitive functioning among residents of buildings with trees and grass (ibid.) (see Figure 2).

In addition, recent evidence suggests that there may be a parallel between cognitive fatigue and ADHD. Symptoms of ADHD appear to be reduced by exposure to nature (Faber Taylor, et al., 2001; Kuo and Faber Taylor, 2004).

Trees and natural areas may also be a mechanism to draw people together, enhance social connections, and bolster a sense of community. Studies of low-income urban residents have found that spaces with trees and vegetation are associated with more social interaction (Coley, et al., 1997) and stronger neighborhood social ties among both younger (Kuo, et al., 1998) and older adults (Kweon, et al., 1998). In a study of rural children,

Journal of Architectural and Planning Research
27:2 (Summer, 2010)          128

TABLE 1. Summary of planning decisions as leverage points that affect the environment and, in turn, health (based on Wrigley, *et al.*, 2003).

| Planning Decisions/ Leverage Point | Residential-Environment Characteristics | Health and Health-Behavior Outcomes |
|---|---|---|
| *Nature and Open Space* | | |
| Comprehensive Plan/General Plan (esp. function plans related to open-space system) | Proximity to park | Cognitive functioning ADHD |
| | Access to nature, open space | Neighborhood social ties Recovery from illness |
| Zoning and Subdivision Ordinances (land-use type, density, incentive zoning to obtain open space, open-space and conservation requirements, landscape ordinances) | Views of nature | Longevity Physical activity |
| Other Land-Use Policies (encourage compact and mixed development through planned unit development; cluster and incentive zoning) | | |
| *Urban Form* | | |
| Comprehensive Plan/General Plan (esp. function plans related to transportation and street planning) | External density Lot sizes | Car use Physical activity Obesity |
| | Mixed use Street network plans | Stress Cardiovascular disease |
| Zoning (land-use type, density) | Road geometry Mass-transit availability | Social interaction |
| Other Land-Use Policies (encourage compact and mixed development through planned unit development; cluster zoning; zoning overlay districts) | Traffic volume | Social connections Sense of community |
| *Food Environment* | | |
| Zoning (land-use type) | Mixed use Proximity to supermarket | Diet (*i.e.*, fruit and vegetables) Physical activity |
| *Housing* | | |
| Zoning and Subdivision Ordinances (land-use type, density, allowable building height, minimum setbacks, lot dimensions, floor area ratios, street standards for sidewalks, parking requirements) | Building height | Injuries Psychological distress |
| | Housing type | Social isolation Strained social relationships |
| | Housing quality | Physical health Safety |
| | Interior density (*i.e.*, people/room) | Physiological stress Reduced social support |

nearby nature was also found to bolster psychological resilience in the face of life stressors (Wells and Evans, 2003).

The natural environment has been associated with physical health and recovery from illness. Patients with views of nature recover more quickly from surgery, request less pain medication, and have shorter hospital stays (Ulrich, 1984). A study within a prison found that inmates with natural views visited the infirmary less often (West, 1986). Since hospital patients and prison inmates do not choose which room they inhabit, these effects of nature are not attributable to personality or some other individual characteristic. The environment influences health. Among older urban-dwelling adults, having space to take a walk and the presence of parks and tree-lined streets near the residence predicts longevity (Takano, *et al.*, 2002). Age, sex, marital status, and SES were statistically controlled in this study.

Proximity to parks and open space has been associated with higher rates of physical activity (*e.g.*, Macdonald, 2007). Most of this evidence is of an associational, rather than causal, nature. In a study of nearly 7,000 adults living in European cities, Ellaway, *et al.* (2005) found that among those living in residential areas with high levels of greenery, the likelihood of being physically active was three times greater and the

Journal of Architectural and Planning Research
27:2 (Summer, 2010)                    129



FIGURE 3.   Percentage of single-family development units
within 1/4 mile of commercial uses by age of neighborhood.
Adapted from Song and Knaap (2004).



FIGURE 4.   Percentage of single-family development units
within 1/4 mile of bus stops by age of neighborhood.
Adapted from Song and Knaap (2004).

likelihood of being overweight or obese was 40% less than for those living in the least green setting. Similarly, Giles-Corti, *et al.* (2005) found that Australians with access to large, attractive public open space were 50% more likely to achieve high levels of walking.

Planning decisions that increase people's access to trees, parks, and open space may contribute to better cognitive functioning and positive psychological well-being, encourage social connections and sense of community, and promote physical activity. Decisions that minimize the concentration of poverty in residential communities or interfere with the cascade of environmental inequities accompanying lower SES (including access to nature) can produce dramatic shifts in community health (see Table 1).

### Elements of Urban Form

Planning exhibits a clear impact on the character of the physical landscape. Through zoning regulations, subdivision ordinances, and other land-use (*e.g.*, growth management) policies, planning decisions affect various elements of urban form and urban development ranging from gross controls of density, land-use mix, noise attenuation, transportation systems, and street patterns to specific streetscape features such as the presence of front porches, sidewalks, and trees. These environmental features, in turn, directly or indirectly affect health.

A compelling example of the potential influence of planning practices is provided by the regional government of Portland, Oregon, which in 1991 began work on the 2040 "Growth Concept" to encourage growth within the Urban Growth Boundary and to discourage sprawl. Plans were implemented through the *Urban Growth Management Functional Plan* in 1996 (Portland Metro Council, 1996). Song and Knaap (2004) examined the effects of Washington County's strong land-use and growth-management policies on pedestrian access and other measures of urban form. Their research showed that new neighborhoods developed after 1990 demonstrate patterns less characteristic of urban sprawl by having improved internal connectivity of streets, greater neighborhood densities, closer proximity of neighborhood to commercial use, and, as shown in Figures 3 and 4, greater pedestrian access to commercial use and bus stops (*ibid.*).

Zoning and subdivision standards, the classical (land-use) planning tools, were originally established for the purpose of protecting "community health, safety, morals, and general welfare" (Lautner, 1941, cited in Ben-Joseph and Szold, 2005:175). Aspects such as soil contamination, unsafe drinking water, and water, air, noise, and light pollution are often times directly controlled in land-use planning through location controls (*i.e.*, site location) and minimum development standards (*e.g.*, minimum setback, sewer and drainage, under-

Journal of Architectural and Planning Research
27:2 (Summer, 2010)                    130

ground utilities, waste control, street lighting, parking). All of these aspects of the environment have well-established pathological effects on health (see Matte and Jacobs, 2000). For example, planning decisions regarding transportation corridors, setbacks, and noise-attenuation treatments have clear impacts on community noise levels. Noise has a well-documented influence on reading acquisition among children, it elevates blood pressure and stress hormones (*e.g.*, cortisol) (Evans, 2001, 2006), and it is a major nuisance, producing widespread annoyance (Berglund, *et al.*, 1999).

Linkages between the environment and health have also been established via the effects of urban form on walking or automobile use. Auto-dependence and lack of physical activity occur in tandem. The same environmental characteristics that distinguish residential, commercial, and manufacturing land use from each other and make auto-dependence unavoidable also make walking and other means of travel impractical. Non-automotive travel, like the use of public transit, is associated with higher levels of walking. For example, Wener and Evans (2007) found that train users are four times more likely than car commuters in Manhattan to walk the recommended 10,000 steps daily. Excessive car use has been linked with obesity (Frank and Schmid, 2004), and sprawl is associated with less walking, higher rates of obesity, and a greater prevalence of hypertension (Ewing, *et al.*, 2003). Long commutes are associated with stress and cardiovascular disease (Koslowsky, *et al.*, 1995; Novaco, *et al.*, 1991), and traffic congestion is a major contributor to job stress (Downs, 1992).

Land-use mixture, density, and street patterns have been found to have important impacts on transportation-mode choice and walking behavior. Studies reveal that reduced automobile usage and increased public-transit ridership and walking are observed in places that are more compact (Friedman, *et al.*, 1994), have more mixed land use (Frank and Pivo, 1995; Handy, 1992), and have gridded street patterns (Kitamura, *et al.*, 1997). For example, Handy (1996a, 1996b) found that residents of neighborhoods within close proximity of commercial areas walked to the store significantly more often than residents of neighborhoods further from commerce. Cervero and Duncan (2003) found that mixed-use settings (both at the trip origin and destination) were associated with transit usage and alternatives to driving alone. The presence of sidewalk infrastructure was also associated with choosing commuting alternatives to the automobile. A comprehensive examination of linkages between the built environment and travel-mode choice is offered by Ewing and Cervero (2001) and Crane and Boarnet (2001). Other studies look at the aggregation of neighborhood features and find that residents of "highly walkable" neighborhoods characterized by higher residential density, mixed land use, and street connectivity are more physically active than residents of "low walkability" neighborhoods (Saelens and Black, *et al.*, 2003). Recent research has attempted to overcome many of the methodological shortcomings that prevailed in earlier research, such as selection bias, incorporating survey data to diminish self-selection (Nasar, 2003), and using longitudinal studies (Krizek, 2003; Wells and Yang, 2008). Frank and Engelke (2001), Handy, *et al.* (2002), Lee and Moudon (2004), and Saelens and Frank, *et al.* (2003) provide reviews of research on the environment and physical activity.

The environment also affects sense of community and social interaction, which have well-documented impacts on health and longevity (Berman and Syme, 1979; Cohen, *et al.*, 1997; House, *et al.*, 1988). Neighborhood configurations may influence sense of community (Kim and Kaplan, 2004; Lund, 2002; Plas and Lewis, 1996). Moreover, higher traffic volume on residential streets is associated with lower levels of social interaction among neighbors (Appleyard and Lintell, 1972). Parents on busier streets restrict their children's outdoor play behavior, which, in turn, strains interpersonal relationships within the home and is associated with fewer friendships among both children and parents (Huttenmoser, 1995).

### *Food Systems, Availability, and Affordability*

Although early planners included food-systems planning as an integral part of their professional responsibilities (Donofrio, 2007; Stein and Bauer, 1934), dietary habits have generally not been considered within the province of planning (Pothukuchi and Kaufman, 1999, 2000). Nevertheless, planners' contributions to decisions about the location of food stores and the allowance of mixed use can affect the food retail landscape in ways that profoundly influence dietary practices with both immediate and long-term implications.

Morland, *et al.* (2002) found that African Americans residing in a census tract where a supermarket was located were 30% more likely to eat the recommended number of daily fruit and vegetable servings than

Journal of Architectural and Planning Research
27:2 (Summer, 2010)          131

TABLE 2.  Increases in fruit and vegetable consumption among those who ate two or fewer servings prior to grocery-store intervention (based on Wrigley, *et al.*, 2003).

| Change Between Pre- and Post-Intervention   Periods | Poor Diets in Pre-Intervention Period (n = 239) | | |
|---|---|---|---|
| | Fruits and Vegetables | Vegetables | Fruit and Fruit Juice |
| Increased | 143 | 129 | 130 |
| No change | 24 | 38 | 36 |
| Decreased | 72 | 72 | 73 |
| In average consumption | | | |
| (portions per day) | +0.44 | +0.18 | +0.26 |
| % change | +34% | +20% | +65% |

TABLE 3.  Increases in fruit and vegetable consumption among those who ate less than one serving prior to grocery-store intervention (based on Wrigley, *et al.*, 2003).

| Change Between Pre- and Post-Intervention   Periods | Poor Diets in Pre-Intervention Period (n = 60) | | |
|---|---|---|---|
| | Fruits and Vegetables | Vegetables | Fruit and Fruit Juice |
| Increased | 45 | 37 | 37 |
| No change | 8 | 14 | 15 |
| Decreased | 7 | 9 | 8 |
| In average consumption | | | |
| (portions per day) | +0.82 | +0.37 | +0.45 |
| % change | +139% | +77% | +409% |

those living in a census tract without a supermarket. A rare "natural experiment" in England involved data collection before and after the construction of a grocery store in a "retail poor" urban area. The new store had no effect on community members' diets on average, but among people with poor diets prior to the intervention, fruit and vegetable consumption increased significantly. For people who ate two or fewer servings of fruit and vegetables prior to the store opening, daily consumption increased by 1/3 — from 1.31 to 1.75 servings per day. Among individuals with the worst diets, who ate less than one serving of fruits and vegetables per day, 75% increased their consumption, and average consumption of fruits and vegetables more than doubled — from .59 to 1.41 servings daily. Moreover, among the 45% of the 615 nearby residents who switched to the new store, there was a 300% increase in walking as the mode of transportation to buy food. One valuable message from this study is that the environment can influence different people's health or health behaviors differently. This intervention was particularly effective in promoting healthy eating among those most nutritionally at risk (Wrigley, *et al.*, 2003) (see Tables 2 and 3). An important strategy for planners and researchers interested in the environment and health is to be alert to natural experiments where changes in the physical environment afford opportunities to compare the health of the same residents before and after the implementation of planning initiatives. This research approach will strengthen the foundation of knowledge for evidence-based decision making.

Other research illustrates that patterns in the food environment parallel the health disparities evident in our society. For example, both availability of heart-healthy foods and the mean number of heart-healthy foods at local stores correlate with neighborhood SES in San Diego (Sallis, *et al.*, 1986). Similarly, Morland, *et al.* (2002) found that wealthier neighborhoods had significantly more supermarkets than poorer neighborhoods, while the poorest neighborhoods had three times more venues for alcohol consumption than the wealthiest neighborhoods.

Planning decisions related to the location of supermarkets, fast food, farmers' markets, and convenience stores influence who has easy access to what kinds of food. Providing community members with access to healthy foods is likely to encourage consumption of those foods and may help, ultimately, to combat the obesity epidemic. Planners can help ensure that the traditional linkage between poverty and lack of access to healthy food is broken. Food-location decisions are particularly critical for low-income and ethnic minority populations who typically experience a wide range of health disparities and do not have the resources to overcome the friction of physical distance to frequent health-food retailers.





FIGURE 5.   Reduced housing problems from
pre- to post-housing intervention.
Adapted from Wells (2000b).

FIGURE 6.   Reduced psychological distress from
pre- to post-housing intervention.
Adapted from Wells (2000b).

### Housing Characteristics and Quality

Many planning decisions directly and indirectly influence the residential experience of people in ways that affect their health. Two aspects of residential settings and health need to be highlighted. First, multiple characteristics of residential settings are often simultaneously affected by housing decisions. To put it differently, planning often alters the ecological context of the residential experience for citizens (*e.g.*, du Toit, 2009). The level of poverty in the community and the household is one very strong influence on exposure to multiple health risks. Second, research on housing characteristics and health typically isolates singular characteristics. Thus, there is a fundamental disjunction between the reality of what planners do and scientific evaluations of the consequences of those actions. Furthermore, as we discuss later in the paper, there is preliminary evidence showing that the health impacts on people of multiple environmental character-istics are more consequential than singular characteristics of the physical and social settings in which people live and work. The building type (*e.g.*, multiple occupancy vs. single family), height, size, and setback; housing quality; and various housing regulations and codes impact residential characteristics. The quality of housing directly and indirectly influences human health and well-being. Sanitation practices (*e.g.*, trash removal, siting of waste collection and storage), fire-prevention technology and location, sewage-system maintenance and capacity, and housing and related public-health code enforcement practices all contribute directly to the ecology of healthy living conditions (Matte and Jacobs, 2000).

Housing quality affects both physical and mental health. With respect to physical health, studies indicate that cold and dampness are associated with respiratory illnesses (Shaw, 2004). And elevated levels of allergens (*e.g.*, cockroaches, dust mites) contribute to asthma (Wigle, 2003). Behavior toxins such as lead are affected by paint and plumbing materials, pesticide residues are influenced by human use as well as building characteristics, and several indoor air pollutants are influenced by housing characteristics such as ventila-tion exchange rates, use of gas for cooking, and certain building materials that release gas chemicals (Krieger and Higgins, 2002; Matte and Jacobs, 2000). In addition, children in low-income areas have greater numbers of injuries that occur in the home (Pomerantz, *et al.*, 2001; Roberts and Power, 1996; Scholer, *et al.*, 1999). This is due to poor housing quality coupled with lax enforcement of housing codes (O'Campo, *et al.*, 2000).

Turning to mental health, people living in better quality housing have fewer psychological symptoms. Evidence includes cross-sectional comparisons with good controls for SES, studies that randomly assigned people to different housing conditions, and longitudinal investigations comparing the same individuals before and after housing improvements (Evans, *et al.*, 2000, 2003; Wells, 2000b). For example, Halpern (1995) examined 117 low-income women living in public housing in the U.K. Half of the homes were remodeled and

upgraded. Anxiety and depression decreased in those receiving housing improvement whereas no changes in psychological symptoms occurred among the other half of the sample. Prior to the housing intervention, the groups had equivalent levels of mental health. Similarly, in a longitudinal study of low-income women living in urban areas throughout Michigan, relocation from inadequate to new housing was statistically linked to improvements in psychological well-being. Improvements in housing quality predicted post-move levels of psychological distress, explaining 12% of the variance in post-move psychological distress after controlling for pre-move distress. These longitudinal data help to establish a causal relationship rather than merely a cross-sectional association between housing and health (Evans, *et al.*, 2000; Wells, 2000b) (Figures 5 and 6).

The scale of housing, in terms of both height and size, has health effects. People living in high-rise housing are more prone to falls. Steep or uneven staircases and absent or poorly maintained handrails are major factors in home falls, particularly for children and frail elderly (Krieger and Higgins, 2002). High-rise housing elevates psychological distress, particularly among low-income mothers of young children. Studies are mostly cross-sectional, but most include statistical controls for SES, and a few are true experiments with random assignment to housing (Evans, *et al.*, 2003). In a landmark study of housing and health, Fanning (1967) examined 1,500 servicemen's wives who were randomly assigned to living accommodations. Physician-documented psychological distress was two times higher among women living on the fourth floor than among those on the ground floor. In another well-designed study, children residing in large, 14-story public housing had significantly greater behavioral problems than their counterparts living in three-story public housing. Families in this study were assigned to buildings according to seniority on waiting lists, which makes it unlikely that selection could account for the differences found (Saegert, 1982).

One likely explanation for some of the mental-health sequelae of high-rise housing, particularly among young families, is social isolation. It is more difficult to let children play outside when one lives high up in a large building (Kim, 1997). Playgrounds and public spaces likely serve a critical social-gathering function for parents of young children. Mental-health data are more equivocal for single-family detached housing than for multifamily housing, with some studies finding adverse effects of multifamily dwelling, but it is difficult to tease out the different roles played by floor level and scale. There is more consistent evidence, however, that interpersonal relationships with neighbors are less positive and that people who live in larger, multifamily dwellings experience lower levels of social support than those who reside in single-family homes (Evans, 2003). The impact of housing on socially supportive relationships is a good illustration of an indirect health effect of planning decisions. Social support is a critical component of mental and physical health. More socially isolated individuals have an elevated risk of ill health.

Crowding, particularly the ratio of people/room, has well-documented adverse effects on mental and physical health. Extremely high density levels exacerbate the spread of infectious diseases. Blood pressure and stress hormones (*e.g.*, cortisol) are also elevated by higher levels of people/room. This has been shown in field studies with controls for SES and in laboratory experiments where people were randomly assigned to different density levels (Evans, 2001). Psychological distress is higher among people in higher density homes. For example, in a prospective study, Lepore, *et al.* (1991) showed that, upon initial occupancy, college students had equivalent levels of psychological distress, but after nine months of living together, those living under higher-density conditions had significantly greater levels of psychological distress. This and other studies suggest that high residential density is inimical to mental health because it undermines the development and maintenance of socially supportive relationships (Evans, 2001; Wells and Harris, 2007). Counterintuitively, living physically closer to more people leads to less social support (Evans and Lepore, 1993). Parents in more crowded homes are also less responsive to their children (Evans, *et al.*, 1999).

## PLANNING AND THE ECOLOGICAL CONTEXT OF HEALTH

Planners make decisions that often affect more than one component of the physical and sociocultural environments. Although the research on environmental risk factors, as reviewed above, has focused on singular risks and health, the convergence of multiple risk factors likely has a stronger impact on mental and physical health compared to singular alterations. Thus, planning decisions that influence neighborhood

and housing quality jointly have more potent health impacts than decisions that affect either of these components singularly. Many of the leverage points that planners affect have direct as well as synergistic influences on health as they co-vary with other health agents. Perhaps the most potent example of this is the ecological context of SES and health. Planners directly and indirectly have the power to strongly affect the interrelations between SES, the physical environment, and health. A large, extensive international literature documents the relationship between both household and neighborhood SES and health (Adler, *et al.*, 1993). Decisions that planners influence have a lot to do with this. The higher the concentration of low SES in a neighborhood, the greater the exposure to environmental hazards including crowding, noise, toxins, substandard housing, hazardous wastes, and ambient pollutants (Evans and Kantrowitz, 2002). Neighborhood SES is also related to amenities that foster physical activity (*e.g.*, parks and low traffic volume) and retail opportunities that support healthy dietary practices (*e.g.*, access to fresh fruits and vegetables and fewer opportunities for fast-food purchases) (Taylor, *et al.*, 2006). Each of these environmental characteristics, in turn, is linked to health. Moreover, the convergence of multiple physical risk hazards mediates some of the well-established relations between SES and health (Evans, 2004). A principal reason why SES is directly related to health is the inverse correlation of SES and hazard exposures. Thus, planning decisions that increase the level and concentration of low SES residences in a neighborhood also foster bad health. Legal and economic barriers to SES segregation and incentives to economic heterogeneity foster better health. Planning practices that uncouple the linkages between SES and environmental inequities will improve the health of poor people.

Combinations of risk factors have ill effects that exceed the impacts of singular risk exposure. To provide a few illustrations, children living in multifamily houses at equivalent levels of people/room evince higher levels of psychological distress than their counterparts living in single-family detached or small row houses (Evans, *et al.*, 2002). Children residing in noisier neighborhoods who attend schools with loud ambient noise have lower reading scores than children in the same noisy schools who reside in quiet neighborhoods (Cohen, *et al.*, 1986). Substandard housing quality combined with deteriorated neighborhood conditions accentuates psychological distress (Kasl, *et al.*, 1982; Katz, *et al.*, 2000). All of this potential exposure to environmental risk is directly influenced by planning decisions.

## IMPLICATIONS FOR PLANNERS

Historically, when planning decisions have been made with public-health concerns in mind, it has been done with a reactive spirit — responding to an infectious-disease epidemic or other crisis. Today, the most common health challenges are of a chronic rather than acute nature. Concerns have shifted from tuberculosis and typhus, for example, to coronary heart disease and obesity. This transition in the profile of disease provides planners with an opportunity to proactively consider the health-related consequences of decision-making. Moreover, in the contemporary planning context, planners are armed with considerable research evidence that equips them to be *proactive*, rather than merely reactive. Planning decisions represent leverage points — small actions that can translate into large health impacts. These decisions are likely to have effects in the short term, as well as substantial long-term ripple effects that influence the health and quality of life of subsequent generations.

Given the considerable evidence indicating that a wide range of environmental characteristics does indeed affect health and the recognition that planners do influence the physical environment, we suggest the following guidelines:

(1) *Explicitly consider health implications when making planning decisions.* Given the abundance of evidence indicating that planning influences the environment and the environment, in turn, affects health, health outcomes must be explicitly included in decision making. It is time for the field of planning to reconnect with public-health concerns in ways that are appropriate to the contemporary health profile of chronic rather than infectious diseases. Short-term economic efficiencies need to be carefully weighed against long-term economic costs resulting from less-healthy communities.

(2) *Employ environmental quality as a leverage point to diminish the SES health gradient.* Income inequalities in health closely track disparities in environmental quality. Housing quality, pollution

Journal of Architectural and Planning Research
27:2 (Summer, 2010)                    135

and toxins, high traffic volume, noise, natural amenities, places to exercise, and availability of healthy foods are not randomly distributed across populations.

(3) *Use a proactive, forward-thinking mindset when making planning decisions.* Rather than merely *reacting* to the public-health concerns of the day, planners need to consider both short-term and long-term impacts of decisions.

(4) *Aim for resilience of individuals and communities, not merely avoiding risk and ill-health.* In the context of human development theory, Dunst and Trivette (1994) have proposed that attention be paid to factors that *promote*, as well as those that deter, healthy development. They suggest that the focus on health and well-being has historically been on reducing risk factors, rather than on bolstering resources to enhance resilience. We apply this notion to planning. Planning should be oriented toward the creation of healthy, thriving communities, not merely the avoidance of illness. Rather than treating diseases such as cardiovascular disease after symptoms are manifest, the planning profession is uniquely positioned to provide environmental contexts that support healthy lifestyles (*e.g.*, physical activity, healthy eating) and minimize exposure to environmental risks (*e.g.*, noise, traffic congestion, substandard housing). Preventative public health and medicine are highly dependent on the profile of environmental risk factors and resources, which is heavily influenced by the actions and policies proposed by planning professionals.

(5) *Employ evidence in decision making.* Considerable research evidence exists to link planning-related environmental outcomes to physical, psychological, and social well-being. This information needs to be integrated into the planning process.

One tool to help planners meet these five recommendations is the health-impact assessment (HIA) (CDC, 2008a; Cole, *et al.*, 2007; Dannenberg, *et al.*, 2006, 2008; Morris, 2006; Thomson, *et al.*, 2003; WHO, 2008). HIAs, analogous to environmental-impact statements, provide a mechanism for making decisions based on research evidence. HIAs vary considerably in form — from checklists to multistep procedures (Dannenberg, *et al.*, 2006). HIAs are not rigorous measurement instruments, but they are valuable tools for raising awareness among planners, public-health officials, and citizens alike (Morris, 2006:75). Although HIAs are in their infancy in the United States, they are a promising mechanism for incorporating health issues into the planning process.

Making health an explicit component of planning is critical (Morris, 2006; USGBC, 2006). By reconnecting with health issues, the field of planning can play a central role in health by reducing rates of illness and fostering healthy, thriving, resilient individuals and communities. The three pillars of contemporary planning policy and practice — law and regulations, economics, and public participation — provide a partial and unbalanced foundation for the profession. A firmer foundation for planning policy and practice will incorporate the conscious and active consideration of health impacts. Planners, whether or not they are aware of it, are major contributors to health and well-being. The more enlightened and active they become in this regard, the greater their contribution to the health and welfare of their fellow citizens will be.

## REFERENCES

Adler NE, Boyce T, Chesney M, Folkman S, Syme L (1993) Socioeconomic inequalities in health. *Journal of the American Medical Association* 269:140-145.

Appleyard D, Lintell M (1972) The environmental quality of city streets. *Journal of the American Planning Association* 38(2):84-101.

Berglund B, Lindvall T, Schewela D (Eds.) (1999) *WHO guidelines for community noise*. Geneva, Switzerland: World Health Organization.

Berman L, Syme L (1979) Social networks, host resistance, and mortality. *American Journal of Epidemiology* 109:186-204.

Journal of Architectural and Planning Research
27:2 (Summer, 2010)          136

Centers for Disease Control and Prevention (CDC) (2004) Deaths: Final data for 2002. *National Vital Statistics Reports* 53(5):1-116.

Centers for Disease Control and Prevention (CDC) (2005a) Mental health in the United States: Prevalence of diagnosis and medication treatment for attention-deficit/hyperactivity disorder — United States, 2003. *MMWR* 54(34):842-847.

Centers for Disease Control and Prevention (CDC), U.S. Cancer Statistics Working Group (2005b) U.S. cancer statistics: 2002 incidence and mortality data. http://www.cdc.gov/cancer/lung/statistics/. Site accessed 26 October 2006.

Centers for Disease Control and Prevention (CDC) (2007a) Figure 6.1: Prevalence of obesity among adults aged 20 years and over: United States, 1997-March 2007. National Center for Health Statistics, National Health Interview Survey. http://www.cdc.gov/nchs/data/nhis/earlyrelease/200709_06.pdf. Site accessed 28 May 2008.

Centers for Disease Control and Prevention (CDC) (2007b) Figure 13.1: Percentage of adults aged 18 years and over who experienced serious psychological distress during the past 30 days: United States, 1997-March 2007. National Center for Health Statistics, National Health Interview Survey. http://www.cdc.gov/nchs/data/nhis/earlyrelease/200709_13.pdf. Site accessed 28 May 2008.

Centers for Disease Control and Prevention (CDC) (2007c) Figure 14.1: Prevalence of diagnosed diabetes among adults aged 18 years and over: United States, 1997-March 2007. National Center for Health Statistics, National Health Interview Survey. http://www.cdc.gov/nchs/data/nhis/earlyrelease/200709_14.pdf. Site accessed 28 May 2008.

Centers for Disease Control and Prevention (CDC) (2007d) Figure 15.1: Percentage of persons of all ages who experienced an asthma episode in the past 12 months: United States, 1997-March 2007. National Center for Health Statistics, National Health Interview Survey. http://www.cdc.gov/nchs/data/nhis/earlyrelease/200709_15.pdf. Site accessed 28 May 2008.

Centers for Disease Control and Prevention (CDC) (2008a) Health impact assessment. http://www.cdc.gov/healthyplaces/hia.htm. Site accessed 28 May 2008.

Centers for Disease Control and Prevention (CDC) (2008b) Heart disease facts. http://www.cdc.gov/heartdisease/facts.htm. Site accessed 28 May 2008.

Centers for Disease Control and Prevention (CDC) (2008c) Overweight and obesity: Overweight prevalence. http://www.cdc.gov/nccdphp/dnpa/obesity/childhood/prevalence.htm. Site accessed 28 May 2008.

Cervero R, Duncan M (2003) Walking, bicycling, and urban landscapes: Evidence from the San Francisco Bay Area. *American Journal of Public Health* 93(9):1471-1477.

Cohen S, Doyle WJ, Skoner DP, Rabin BS, Gwaltney JM (1997) Social ties and susceptibility to the common cold. *Journal of the American Medical Association* 277:1940-1944.

Cohen S, Evans GW, Stokols D, Krantz DS (1986) *Behavior, health, and environmental stress*. New York: Plenum.

Cole BL, Shimkhada R, Morgenstern H, Kominski G, Fielding JE, Wu S (2007) Projected health impact of the Los Angeles City living wage ordinance. *Journal of Epidemiology and Community Health* 59:645-650.

Coley RL, Kuo FE, Sullivan WC (1997) Where does community grow? The social context created by nature in urban public housing. *Environment and Behavior* 29:468-494.

Crane RC, Boarnet MG (2001) *Travel by design*. New York: Oxford University Press.

Dannenberg AL, *et al.* (2006) Growing the field of health impact assessment in the United States: An agenda for research and practice. *American Journal of Public Health* 96(2):262-270.

Dannenberg AL, Bhatia R, Cole BL, Heaton SK, Feldman JD, Rutt CD (2008) Use of health impact assessment in the U.S. *American Journal of Preventive Medicine* 34(3):241-256.

Donofrio GA (2007) Feeding the city. *Gastronomica* Fall:31-41.

Downs A (1992) *Stuck in traffic: Coping with peak-hour traffic congestion*. Washington, DC: Brookings Institution Press.

du Toit JL (2009) Utopia on trial again: Perceived residential quality at Schubart Park in post-apartheid South Africa. *Journal of Architectural and Planning Research* 26(2):159-175.

Dunst CJ, Trivette CM (1994) Methodological considerations and strategies for studying the long-term effects of early intervention. In SL Friedman and HC Haywood (Eds.), *Developmental followup: Concepts, domains, and methods*. San Diego, CA: Academic Press, pp. 277-313.

Ellaway A, Macintyre S, Bonnefoy X (2005) Graffiti, greenery, and obesity in adults: Secondary analysis of European cross sectional survey. *British Medical Journal* 331(7517):611-612.

Evans GW (2001) Environmental stress and health. In A Baum, T Revenson, and JE Singer (Eds.), *Handbook of health psychology*. Mahwah, NJ: Erlbaum, pp. 365-385.

Evans GW (2003) The built environment and mental health. *Journal of Urban Health* 80:536-555.

Evans GW (2004) The environment of childhood poverty. *American Psychologist* 59:77-92.

Evans GW (2006) Child development and the physical environment. *Annual Review of Psychology* 57: 423-451.

Evans GW, Kantrowitz E (2002) Socioeconomic status and health: The potential role of environmental risk exposure. *Annual Review of Public Health* 23:303-331.

Evans GW, Lepore SJ (1993) Household crowding and social support: A quasi-experimental analysis. *Journal of Personality and Social Psychology* 65(2):308-316.

Evans GW, Lercher P, Kofler W (2002) Crowding and children's mental health: The role of housing type. *Journal of Environmental Psychology* 22:221-232.

Evans GW, Maxwell LE, Hart B (1999) Parental language and verbal responsiveness to children in crowded homes. *Developmental Psychology* 35:1020-1023.

Evans GW, Wells NM, Chan HE, Saltzman H (2000) Housing quality and mental health. *Journal of Consulting and Clinical Psychology* 68(3):526-530.

Evans GW, Wells NM, Moch A (2003) Housing and mental health: A review of the evidence and a methodological and conceptual critique. *Journal of Social Issues* 59(3):475-500.

Journal of Architectural and Planning Research
27:2 (Summer, 2010)          138

Ewing R, Cervero R (2001) Travel and the built environment: A synthesis. *Transportation Research Record* 1780:87-114.

Ewing R, Schmid T, Killingsworth R, Zlot A, Raudenbush S (2003) Relationship between urban sprawl and physical activity, obesity, and morbidity. *American Journal of Health Promotion* 18(1): 47-57.

Faber Taylor A, Kuo FE, Sullivan WC (2001) Coping with ADD: The surprising connection to green play settings. *Environment and Behavior* 33:54-77.

Faber Taylor A, Kuo FE, Sullivan WC (2002) Views of nature and self-discipline: Evidence from inner city children. *Journal of Environmental Psychology* 22:49-63.

Fanning DM (1967) Families in flats. *British Medical Journal* 4:382-386.

Frank LD, Engelke PO (2001) The built environment and human activity patterns: Exploring the impacts of urban form on public health. *Journal of Planning Literature* 16(2):202-218.

Frank LD, Engelke PO, Schmid TL (2003) *Health and community design: The impact of the built environment on physical activity*. Washington, DC: Island Press.

Frank LD, Pivo G (1995) Impacts of mixed use and density on utilization of three modes of travel: Single-occupant vehicle, transit, and walking. *Transportation Research Record* 1466:44-52.

Frank LD, Schmid TL (2004) Obesity relationships with community design, physical activity, and time spent in cars. *American Journal of Preventive Medicine* 27:87-96.

Friedman B, Gordon SP, Peers JB (1994) Effect of neotraditional neighborhood design on travel characteristics. *Transportation Research Record* 1466:63-70.

Friis RH (2007) *Essentials of environmental health*. Sudbury, MA: Jones & Bartlett.

Frumkin H (2001) Beyond toxicity: The greening of environmental health. *American Journal of Preventive Medicine* 20:234-240.

Frumkin H, Frank L, Jackson R (2004) *Urban sprawl and public health: Designing, planning and building for healthy communities*. Covelo, CA: Island Press.

Giles-Corti B, *et al.* (2005) Increasing walking: How important is distance to, attractiveness, and size of public open space? *American Journal of Preventive Medicine* 28(2)(Supp. 2):169-176.

Halpern D (1995) *Mental health and the built environment*. London: Taylor & Francis.

Handy SL (1992) Regional versus local accessibility: Neo-traditional development and its implications for nonwork travel. *Built Environment* 18(4):253-267.

Handy SL (1996a) Understanding the link between urban form and nonwork travel behavior. *Journal of Planning, Education and Research* 15(3):183-198.

Handy SL (1996b) Urban form and pedestrian choices: Study of Austin neighborhoods. *Transportation Research Record* 1552:135-144.

Handy SL, Boarnet MG, Ewing R, Killingsworth RE (2002) How the built environment affects physical activity: Views from urban planning. *American Journal of Preventive Medicine* 23(2):64-73.

Hartig T, Mang M, Evans GW (1991) Restorative effects of natural environment experiences. *Environment and Behavior* 23:3-26.

House JS, Landis KR, Umberson D (1988) Social relationships and health. *Science* 241(4865):540-545.

Huttenmoser M (1995) Children and their living surroundings: Empirical investigations into the significance of living surroundings for the everyday life and development of children. *Children's Environments* 12:403-413.

Kaplan S (1995) *The restorative benefits of nature: A psychological perspective*. New York: Cambridge University Press.

Kaplan S, Kaplan R (1983) *Cognition and environment: Functioning in an uncertain world*. Ann Arbor, MI: Ulrich's.

Kasl SW, Will J, White M, Marcuse P (1982) Quality of the residential environment and mental health. In A Baum and JE Singer (Eds.), *Advances in environmental psychology*. Hillsdale, NJ: Erlbaum, pp. 1-30.

Katz L, Kling J, Leibman J (2000) *Moving to opportunity in Boston: Early results of a randomized mobility experiment* (Working Paper No. 7973). Cambridge, MA: National Bureau of Economic Research.

Kim J, Kaplan R (2004) Physical and psychological factors in sense of community: New Urbanist Kentland and nearby Orchard Village. *Environment and Behavior* 36:313-340.

Kim W (1997) Effect of dwelling floor level on factors related to residential satisfaction and home environment in high-rise apartments. Doctoral dissertation, Texas A&M University, College Station.

Kitamura R, Laidet L, Mokhtarian PL (1997) A micro-analysis of land use and travel in five neighborhoods in the San Francisco Bay Area. *Transportation Research Part D: Transportation and Environment* 24:125-158.

Koslowsky M, Kluger A, Reich M (1995) *Commuting stress*. New York: Plenum.

Krieger J, Higgins DL (2002) Housing and health: Time again for public health action. *American Journal of Public Health* 92(5):758-768.

Krizek KJ (2003) Residential relocation and changes in urban travel: Does neighborhood-scale urban form matter? *Journal of the American Planning Association* 69(3):265-281.

Kuo FE (2001) Coping with poverty: Impacts of environment and attention in the inner city. *Environment and Behavior* 33:5-34.

Kuo FE, Faber Taylor A (2004) A potential natural treatment for attention-deficit/hyperactivity disorder: Evidence from a national study. *American Journal of Public Health* 94:1580-1586.

Kuo FE, Sullivan WC, Coley RL, Brunson L (1998) Fertile ground for community: Inner-city neighborhood common spaces. *American Journal of Community Psychology* 26:823-851.

Kweon B, Sullivan WS, Wiley AR (1998) Green common spaces and social integration of inner-city older adults. *Environment and Behavior* 30(6):832-858.

Lautner H (1941) *Subdivision regulation: An analysis of land subdivision control practices.* Chicago: Public Administration Service. Cited in E Ben-Joseph and TS Szold (Eds.) (2005) *Regulating place: Standards and the shaping of urban America.* Cambridge, MA: Routledge, p. 175.

Lee C, Moudon A (2004) Physical activity and environment research in the health field: Implications for urban and transportation planning practice and research. *Journal of Planning Literature* 19(2):147-181.

Lepore SJ, Evans GW, Schneider M (1991) The dynamic role of social support in the link between chronic stress and psychological distress. *Journal of Personality and Social Psychology* 61: 899-909.

Louv R (2005) *Last child in the woods: Saving our children from nature-deficit disorder.* Chapel Hill, NC: Algonquin Books.

Lund H (2002) Pedestrian environments and sense of community. *Journal of Planning Education and Research* 21(3):301-312.

Macdonald E (2007) Urban waterfront promenades and physical activity by older adults: The case of Vancouver. *Journal of Architectural and Planning Research* 24(3):181-198.

Matte TD, Jacobs DE (2000) Housing and health. *Journal of Urban Health* 77:7-25.

Morland K, Wing S, Roux AD, Poole C (2002) Neighborhood characteristics associated with the location of food stores and food service places. *American Journal of Preventive Medicine* 22(1): 23-29.

Morris M (Ed.) (2006) *Integrating planning and public health: Tools and strategies to create healthy places* (Planning Advisory Service Report No. 539/540). Chicago: American Planning Association.

Nasar J (2003) Does neotraditional development build community? *Journal of Planning Education and Research* 23:58-68.

Novaco R, Kliewer W, Broquet A (1991) Home environmental consequences of commute travel impedance. *American Journal of Community Psychology* 19:881-909.

O'Campo P, Rao RP, Gielen AC, Royalty W, Wilson M (2000) Injury producing events among children in low income communities. *Journal of Urban Health* 77:34-49.

Olmsted FL (1865/1952) The Yosemite Valley and Mariposa big trees. *Landscape Architecture* 43(1):12-25.

Plas JM, Lewis SE (1996) Environmental factors and sense of community in a planned town. *American Journal of Community Psychology* 24:109-143.

Pomerantz WJ, Dowd MD, Buncher CR (2001) Relationship between socioeconomic factors and severe childhood injuries. *Journal of Urban Health* 78:141-153.

Portland Metro Council (1996) Urban growth management functional plan. http://library.oregonmetro.gov/files/chap307.pdf. Site accessed 28 May 2008.

Pothukuchi K, Kaufman JL (1999) Placing the food system on the urban agenda: The role of municipal institutions in food system planning. *Agriculture and Human Values* 16(2):213-224.

Journal of Architectural and Planning Research
27:2 (Summer, 2010)          141

Pothukuchi K, Kaufman JL (2000) The food system: A stranger to the planning field. *Journal of the American Planning Association* 66(2):113-124.

Roberts I, Power C (1996) Does the decline in child injury mortality vary by social class? A comparison of class-specific mortality in 1981 and 1991. *British Medical Journal* 313:784-786.

Rosen G (1958) *A history of public health.* New York: MD Publications.

Saegert S (1982) Environments and children's mental health: Residential density and low income children. In A Baum and JE Singer (Eds.), *Handbook of psychology and health.* Hillsdale, NJ: Erlbaum, pp. 247-271.

Saelens BE, Black JB, Sallis JF, Chen D (2003) Neighborhood-based differences in physical activity: An environment scale evaluation. *American Journal of Public Health* 93(9):1552-1558.

Saelens BE, Frank LD, Sallis JF (2003) Environmental correlates of walking and cycling: Findings from the transportation, urban design, and planning literature. *Annuals of Behavioral Medicine* 25(2):80-91.

Sallis JF, Nader PR, Rupp JW, Atkins CJ, Wilson WC (1986) San Diego surveyed for heart-healthy foods and exercise facilities. *Public Health Reports* 101(2):216-219.

Scholer SJ, Hickson GB, Ray WA (1999) Sociodemographic factors identify U.S. infants at high risk of injury mortality. *Pediatrics* 103:1183-1188.

Shaw M (2004) Housing and public health. *Annual Review of Public Health* 25:397-418.

Sherman A (1994) *Wasting America's future: The Children's Defense Fund report on the cost of child poverty.* Boston: Beacon.

Sloane DC (2006) From congestion to sprawl: Planning and health in historical context. *Journal of the American Planning Association* 72(1):10-18.

Song Y, Knaap G (2004) Measuring urban form: Is Portland winning the war on sprawl? *Journal of the American Planning Association* 70(2):210-225.

Stein CS, Bauer C (1934) Store buildings and neighborhood shopping centers. *Architectural Record* 75(2):174-187.

Takano T, Nakamura K, Watanabe M (2002) Urban residential environments and senior citizens' longevity in megacity areas: The importance of walkable green spaces. *Journal of Epidemiology and Community Health* 56:913-918.

Taylor WC, Poston WSC, Jones L, Kraft MK (2006) Environmental justice, obesity, physical activity, and healthy living. *Journal of Physical Activity and Health* 3:S30-S54.

Tennessen CM, Cimprich B (1995) Views to nature: Effects on attention. *Journal of Environmental Psychology* 15:77-85.

Thomson H, Petticrew M, Douglas M (2003) Health impact assessment of housing improvements: Incorporating research evidence. *Journal of Epidemiology and Community Health* 57:11-16.

Ulrich RS (1984) View through a window may influence recovery from surgery. *Science* 224(4647):420-421.

U.S. Department of Health and Human Services (2001) Healthy people 2010: Understanding and improving health. http://www.healthypeople.gov/Document/tableofcontents.htm#uih. Site accessed 27 October 2006.

U.S. Green Building Council (USGBC) (2006) Understanding the relationship between public health and the built environment: A report prepared for the LEED-ND Core Committee. https:// www.usgbc.org/ShowFile.aspx?DocumentID=1480. Site accessed 28 May 2008.

U.S. Supreme Court (1926) Village of Euclid, Ohio, v. Ambler Realty Co. decision, 272 U.S. 365.

Wells NM (2000a) At home with nature: The effects of nearby nature on children's cognitive functioning. *Environment and Behavior* 32:775-795.

Wells NM (2000b) Housing and well-being: A longitudinal investigation of low-income families transitioning to new dwellings. Doctoral dissertation, University of Michigan, Ann Arbor.

Wells NM, Evans GW (2003) Nature as a buffer: Life stress among rural children. *Environment and Behavior* 35(3):311-330.

Wells NM, Harris JD (2007) Housing quality, psychological distress, and the mediating role of social withdrawal: A longitudinal study of low-income women. *Journal of Environmental Psychology* 27:69-78.

Wells NM, Yang Y (2008) Neighborhood design and walking: A quasi-experimental longitudinal study. *American Journal of Preventive Medicine* 34(4):313-319.

Wener RE, Evans GW (2007) A morning stroll: Levels of physical activity in car versus mass transit commuting. *Environment and Behavior* 39(1):62-74.

West MJ (1986) Landscape views and stress responses in the prison environment. Master's thesis, University of Washington, Seattle.

Wigle DT (2003) *Child health and the environment*. New York: Oxford University Press.

World Health Organization (WHO) (1946) Constitution of the World Health Organization. http:// www.opbw.org/int_inst/health_docs/WHO-CONSTITUTION.pdf. Site accessed 29 May 2008.

World Health Organization (WHO) (2008) Health impact statement. www.who.int/hia/en/index.html. Site accessed 29 May 2008.

Wrigley N, Warm D, Margetts B (2003) Deprivation, diet and food retail access: Findings from the Leeds "food deserts" study. *Environment and Planning A* 35(1):151-188.

Additional information may be obtained by writing directly to Dr. Wells at Department of Design and Environmental Analysis, College of Human Ecology, E220 MVR Hall, Cornell University, Ithaca, NY 14853, USA; email: nmw2@cornell.edu.

## ACKNOWLEDGMENTS

Our thanks to Greg Donofrio for valuable feedback on an earlier draft of this article. Support for this paper was provided by the Robert Wood Johnson Foundation, the John D. and Catherine T. MacArthur Foundation Network of Socioeconomic Status and Health, and the William T. Grant Foundation.

Journal of Architectural and Planning Research
27:2 (Summer, 2010)                   143

AUTOBIOGRAPHICAL SKETCHES

Nancy M. Wells is an associate professor in the Department of Design and Environmental Analysis and the Bronfenbrenner Life Course Center within the College of Human Ecology at Cornell University. Her research focuses on the relationship between both the built and natural environment and human behavior, health, and functioning.

Gary W. Evans is the Elizabeth Lee Vincent Professor of Human Ecology, Departments of Design and Environmental Analysis and of Human Development at Cornell University. He is interested in the effects of the physical environment on children and their families. His major research interests include environmental stressors, housing, and poverty.

Yizhao Yang is an assistant professor in the Department of Planning, Public Policy and Management at the University of Oregon. Her research focuses on social and environmental aspects of physical planning, particularly issues related to good urban form pertaining to healthier, more affordable, and more sustainable environments.

Manuscript revisions completed 9 December 2009.



# Pedestrian Environment Data Scan

# AUDIT PROTOCOL

## CONTENTS

**GENERAL DIRECTIONS AND PROCEDURES**          PAGE 2

    **QUESTION BREAKDOWN**

**SECTION 0: SEGMENT NUMBER AND TYPE**          PAGE 3

**SECTION A: ENVIRONMENT**          PAGE 4

**SECTION B: PEDESTRIAN FACILITY**          PAGE 5

**SECTION C: ROAD ATTRIBUTES**          PAGE 8

**SECTION D: WALKING/CYCLING ENVIRONMENT**          PAGE 11

**SECTION SA: SUBJECTIVE ASSESSMENT**          PAGE 13

Audit Protocol written by Andréa D. Livi -  Spring 2004.

**GENERAL DIRECTIONS:**
Surveyors will go out each day with their team. Maps of segments and a list of segments will be given each morning to direct surveyors regarding which segments they should survey. Surveyors will return to Caroline Hall each day to upload completed entries.
In case of inclement weather, the Undergraduate and Graduate Fellows will assess the situation and decide whether surveying should be postponed.

**SUPPLIES:**
- Map of area with segments detailed
- Master list of segments
- PDA

**PROCEDURES AT EACH SEGMENT:**
1. Identify the segment on your map and check it against the master list. Start a new entry and input the segment number, your name, the time, day and weather.
2. Make sure you locate the beginning and endpoint of the segment. Look at the map to find the information.
3. Walk the segment once WITHOUT writing anything on the survey form. You should look around in all directions, without forgetting to look up and down as well.
4. Walk the segment again, this time while filling out the survey (as explained below). Go back and forth as often as necessary in order to fill in each question. Make sure you are in agreement with your teammate about your choices.
NOTE: The audit only consists of "check" (boxes) and "fill in number" (line) questions. For the numeric answer, use integers only. If you need to round the number, always round up.
5. When you have filled each question, go over the entire survey again to make sure you have completely answered the form and that you are satisfied with your answers (in the paper audit, this means you will have at least one check mark per cluster of boxes). You can then move on to the next segment, following the same procedure.
6. Make sure to record any modifications such as segments that are merged or do not exist. Also, make note of any questions or problems that arose while surveying the segment.

**QUESTION BREAKDOWN:**
The following section of the protocol describes each question and response category to aid the administrators in dealing with variations in the environment. The administrators are encouraged to read through this section and use it as a reference while surveying the segments.
For each question, the name and number are in **bold**, the answer options are in *italics* and the comments, definitions or directions in regular text.

# SECTION 0: SEGMENT NUMBER & TYPE  ━━━━━━━━━━━━━━━

## 0. Segment Type
*Low volume road – audit both sides*
*High volume road – audit this side only*
*Bike or ped path – skip section C*
Options 1 and 2 will be defined prior to the administration of the survey. If the segment on the map has two lines instead of one, it will be considered a "high volume road".



In the illustration at left, segment 164 is a low volume road and segments163 and 961 are a high volume road.
"Bike or ped path" is to be checked off if there is no automobile access roadway in the segment.

High volume roads will only be audited on one side for all questions except questions 3. Segment Intersections (count ALL intersections) and 15:.Number of Lanes (count ALL lanes).

# SECTION A: ENVIRONMENT ━━━━━━━━━━━━━━━━

## 1. Uses In Segment

Count EVERY USE within the segment. That is: every use within the boundary formed by making a right-angle line from the beginning and end of the segment. Uses only count if there is access to it in the segment, like a driveway, walkway, or entrance. Access to a back door or a loading dock would count as access. Abandoned buildings do not qualify as vacant. Instead, count them under their intended use.



### Answer Options

*Housing – Single Family Detached*

*Housing – Multi-Family*: attached housing, apartments, duplexes.

*Housing – Mobile Homes*

*Office/Institutional*: office parks, corporate campuses, public buildings, schools, churches, hospitals etc. This also includes professional offices in residential buildings (dentist, lawyer, doctor, accountant, etc.)

*Restaurant/Café/Commercial*: restaurants, stores, malls, gas stations etc.

*Industrial*: factories, mills, industrial complexes, etc.

*Vacant/Undeveloped:* cleaned or cleared off lots, naturally occurring vegetation, natural features such as lakes and rivers.

*Recreation*: parks, golf courses, basketball courts etc. Official paths coming off a segment can count as recreation.


## 2. Slope

### Answer Options

*Flat*: there is no discernable hill walking the segment.

*Slight Hill*: there is a slight hill in the segment, but not enough to make walking uphill difficult.

*Steep Hill*: the hill in the segment makes walking or biking it difficult.


## 3. Segment Intersections (check all that apply)

### Answer Options

*Segment has 3-way intersection*

*Segment has 4-way intersection*

*Segment has other intersection*

*Segment deadends*

*Segment deadends but path continues*

*Segment has no intersections*

# SECTION B: PEDESTRIAN FACILITY ━━━━━━━━━━

If there is no pedestrian facility in the segment, skip to section C

Note: A pedestrian facility does not count if it is a private walk in front of a single family house. It would count if it is a facility in front of a commercial center intended to be used as a sidewalk. An incomplete sidewalk in front of a residential home counts if it looks as though it was built by the city.

## 4. Type(s) of Pedestrian Facility (check all that apply)
### Answer Options
*Footpath (worn dirt path)*
*Paved Trail:* a paved trail is any paved walkway that is not associated with a roadway.
*Sidewalk:* a walkway will only be considered a sidewalk if it is associated with a roadway.
*Pedestrian Street (closed to cars)*

NOTE: The rest of the questions in this section refer to the BEST pedestrian facility selected above.

## 5. Path Material
Select all that apply. Even if one material is just a patch in the sidewalk, please mark it.
### Answer Options
*Asphalt*
*Concrete*
*Paving Bricks or Flat Stone*
*Gravel*
*Dirt or Sand*

## 6. Sidewalk Condition/Maintenance
### Answer Options
*Poor (many bumps/cracks/holes):* A sidewalk will be considered "poor" if a stroller cannot be
    pushed along the sidewalk without many jarring motions and/or if it clearly needs to be
    replaced (patches would not be sufficient)
*Fair (some bumps/cracks/holes):* A sidewalk will be considered "fair" if a stroller can easily be
    pushed along the sidewalk with few jarring motions to the passenger and/or it only needs
    patches or other minor repair.
*Good (very few bumps/cracks/holes):* A sidewalk will be considered "good" if a stroller can
    easily be pushed along the sidewalk without jarring motions to the passenger and/or it needs
    no repair at this time.
*Under Repair:* A sidewalk will only be considered "under repair" if there is evidence of work
    being done to improve the sidewalk. Orange cones are not enough. If construction work is
    being done adjacent to the sidewalk, blocking it off as a result, it is considered "under
    repair."

## 7. Path Obstructions (check all that apply)

NOTE: An object is only a path obstruction if it severely reduces or completely blocks off the pedestrian facility. Threshold: Could you get by in wheelchair or while pushing a stroller?

For this question, you are looking at potential obstructions on ALL pedestrian facilities on the street. In other words, if there are two sidewalks and only one has obstructions, please write down those obstructions.

### Answer Options

*Poles or Signs*
*Parked Cars*: cars in driveways that block the sidewalk should be counted.
*Greenery*
*Garbage Cans*
*Other*
*None*

If the pedestrian facility in the segment is not a sidewalk, skip now to section C

## 8. Buffers between road and path (check all that apply)

### Answer Options

*Fence*
*Trees*: trees are only a buffer if they are part of a landscape/grass buffer or if they occur regularly enough on the street to discourage pedestrians from walking along the roadway. Trees within a grass buffer count as a buffer.
*Hedges*
*Landscape*
*Grass*
*None*

## 9. Distance from curb

### Answer Options

*At Edge*
*< 5 feet*
*> 5 feet*

If possible, use a tape measure to measure the distance and round up to the next integer. If no tape measure is available, measure by using your feet and rounding to the next highest integer. If it seems too dangerous to walk to the roadway, measure by using context clues. If the sidewalk distance from the curb varies, use the average or typical distance.

## 10. Sidewalk width

### Answer Options

*< 4 feet*
*Between 4 and 8 feet*
*> 8 feet*

If possible, use a tape measure to measure the distance, not including the curb, and round up to the next integer. If no tape measure is available, measure by using your feet and rounding to the next highest integer. If sidewalk width varies, use the average or typical width.

## 11. Curb Cuts
### Answer Options
*None*
*1 to 4*
*> 4*

## 12. Sidewalk Completeness/Continuity
This refers to the completeness of the sidewalk WITHIN the segment.
### Answer Options
*Sidewalk is complete*: a sidewalk is complete if it does not have any breaks within the segment.
*Sidewalk is incomplete*: a sidewalk is incomplete if it ends or has gaps within the segment.

## 13. Sidewalk connectivity to other sidewalks/crosswalks
This refers to the number of connections the segment sidewalk has to crosswalks and other sidewalks. Stop signs at the end of the segment can be treated as a crosswalk. This will be scored as follows:

At the beginning of the segment, looking backward 180 degrees, +90 degrees and –90 degrees: how many sidewalks or crosswalks are there?

At the end of the segment, looking forward, +90 degrees and –90 degrees: how many sidewalks or crosswalks are there?

In the middle of the segment: are how many sidewalks or crosswalks are there?

These three scores should be added to make up the connectivity score.

A very well connected segment will have a score of six plus any crosswalks that may exist along the segment.



Connections to other sidewalks crosswalks in diagram above shown in red. The above diagram has 8 connections.

On a low volume residential segment there does not need to be a crosswalk in order to count as a connection.

Connections made by crossing the street to another side where a sidewalk exists does not count.

## SECTION C: ROAD ATTRIBUTES ━━━━━━━━━━━━━━━━━━━━━━

NOTE: skip this section if path only

## 14. Condition of Road
### Answer Options
*Poor (many bumps/cracks/holes)*: the potholes, cracks, etc. present would cause a vehicle driving
   the segment to rock, dip or otherwise disrupt driving.
*Fair (some bumps/cracks/holes)*: there are potholes, cracks etc., but not enough to cause
   problems for a vehicle driving the segment.
*Good (very few bumps/cracks/holes)*: there are no large potholes or other problems that would
   cause problems for a vehicle driving the segment.
*Under Repair:* A roadway will only be considered "under repair" if there is evidence of work
   being done to improve it. Orange cones are not enough.

## 15. Number of Lanes
*Minimum number of lanes to cross*
*Maximum number of lanes to cross*
Count ALL lanes (even if it is a high volume road), including turn only lanes and/or "suicide
lanes" one would need to cross the road at its widest point along the segment.

## 16. Posted Speed Limit
### Answer Options
*None Posted*
*(mph):* _____
Check the "none posted" box unless there is a sign WITHIN the segment that displays the speed
limit. Even if there is a sign outside the segment, within plain view, it does not count.

## 17. On Street Parking
If pavement is unmarked, check "parallel" only if there are cars parked within the segment or if
parking signs are present.
### Answer Options
*Parallel or Diagonal*
*None*

## 18. Off-Street Parking Lot Spaces
**Answer Options**

| 0-5 | 6-25 | 26+ |
|-----|------|-----|
|     |      |     |

Count all off-street parking spaces in segment. Cars in single family home driveways do not count. Only cars in actual parking lots count (apartment complexes, commercial parking, office parking etc.) There must be access to the lot from the segment.

## 19. Must you walk through a parking lot to get to most buildings?
**Answer Options**

*Yes*
*No*
For this question, the origin point of walking to the buildings will be from the sidewalk. If there is no sidewalk, origin point will be the curb of the roadway.

## 20. Presence of High-Medium Volume Driveways
**Answer Options**

*< 2*
*2 to 4*
*> 4*
High-medium volume driveways are driveways that often have cars pulling in and out, like commercial driveways or driveways of apartment buildings. Single-family residential driveways are low volume and should not be counted here.

## 21. Traffic Control Devices (check all that apply)
Count only the traffic control devices within the segment, not those that are visible but outside the segment (they will be captured when the next segment is surveyed.)
**Answer Options**

*Traffic Light*
*Stop Sign*
*Traffic Circle:* counts on all the segments that go into the circle. Triangular traffic control devices can also be counted under this category.
*Speed Bumps*
*Chicanes or Chokers*: chicanes are a series of narrowings or curb extensions that alternate from one side of the street to the other forming S-shaped curves. Chokers are curb extensions at midblock or intersection corners that narrow a street by extending the sidewalk or widening the planting strip.

## 22. Crosswalks
### Answer Options
*None*
*1 to 2*
*3 to 4*
*> 4*
Make sure to note all marked crosswalks in segment. "Marked" refers to lines on the pavement (but *not* automobile stop lines) or signs, lights or signals.

## 23. Crossing Aids in Segment (check all that apply)
### Answer Options
Cars Must Stop
*Pavement Markings*
*Yield to Ped Paddles*
*Pedestrian Signal*
Crossing Aids
*Median/Traffic Island*
*Curb Extension*
*Overpass/Underpass*
Warnings to Cars
*Pedestrian Crossing Street Sign*: street sign without flashing light.  Children at play signs can also be included here.  Yield signs for cars do not count.
*Flashing Warning*
*Share the Road Warning*

## 24. Bicycle Facilities (check all that apply)
### Answer Options
*No designated bikeway*
*Bicycle route signs*
*Striped bicycle lane designation*
*Visible bicycle parking facilities*: these facilities must be useable by the public, not for private use only
*Bicycle crossing warning.*

## SECTION D: WALKING/CYCLING ENVIRONMENT

### 25. Roadway/Path Lighting
#### Answer Options
*No Lighting*: there is no artificial lighting in the area.

*Road-oriented lighting:* there are public light fixtures that aim light at the road or are very high and illuminate broad expanses.

*Pedestrian-scale lighting*: there are public light fixtures that aim light at the walking path.

*Other lighting*: lighting from stores, apartments etc. that lights the road and/or pedestrian path.

### 26. Amenities (check all that apply)
Must be for public use.  Also, visible and accessible from the pedestrian path.
#### Answer Options
*Garbage Cans*: only public use garbage cans count. Residential garbage cans do not count.

*Benches*

*Water Fountain*

*Street Vendors/Vending Machines*: this includes soda machines, candy machines, public pay phones, mailboxes and newspaper dispensers.

### 27. Are there Wayfinding Aids Present?
#### Answer Options
*Yes* A wayfinding aid is a sign identifying the name of the cross streets. Any sign visible from the segment at the pedestrian level counts as a wayfinding aid, even if it is actually located on another segment.

*No*

### 28. Number of Trees Shading Path
#### Answer Options
*None or Very Few*: the path is not shaded by any trees (or only one tree) along the segment. (less than 25% is covered)

*Some*: the path is covered between 25 and 75% of the way.

*Many/Dense*: more than 75% of the path is shaded by trees.

### 29. Degree of Enclosure
#### Answer Options
For this question, take into account both the buildings and natural features (trees, bushes etc.)

*Little or no enclosure*: the view from the sidewalk is open in both directions for more than 15 feet for most of the segment. It is a wide-open, unconstrained space.



Well-Enclosed Street                    Poorly Enclosed Street

*Some enclosure*: the view is partially enclosed, but there is still some wide-open spaces.

*Highly enclosed*: the buildings lining the street are within 10 feet of the sidewalk and there is a cross-sectional design ratio of approximately one (height) to two (width), or less.

## 30. Powerlines along segment?
Power lines that cross or run parallel to the segment all count in this question.
### Answer Options
*No*
*Low Voltage/Distribution Line*
*High Voltage/Transmission Line*

## 31. Overall Cleanliness and Building Maintenance
Leaves, branches, and brush, all count towards cleanliness based on the amount and if it is clearly visible and in the pedestrian path.
### Answer Options
*Poor*: there is noticeable garbage, graffiti and/or broken glass along the segment.
*Fair*: there are a few wrappers, or other litter but no graffiti or other garbage evident.
*Good:* there is no obvious garbage, graffiti, litter or broken glass in the segment.

## 32. Articulation of Building Designs
### Answer Options
*Little or no articulation*: the façades of buildings along the segment are unadorned and do not have many window openings.
*Some articulation*: the façades of buildings along the segment are similar in style and/or are not very ornate.
*Highly articulated*: the façades of buildings along the segment are complex and varied.

## 33. Building Setbacks
### Answer Options
*At edge of sidewalk*
*Within 20 feet of sidewalk*
*More than 20 feet from sidewalk*

## 34. Building Height
### Answer Options
*Short*: 1-2 stories, except with big box buildings or other buildings with tall floors.
*Medium*: 3-5 stories (with same exceptions.)
*Tall:* buildings taller than 5 stories (with same exceptions.)
NOTE: Average height is to be measured here, not the maximum or minimum height.

## 35. Bus Stops
### Answer Options
*Bus stop with shelter*
*Bus stop with bench*
*Bus stop with signage only*

## SECTION SA: SUBJECTIVE ASSESSMENT ━━━━━━━━━━━

Enter 1, 2, 3 or 4 for:
1 = Strongly Agree
2 = Agree
3 = Disagree
4 = Strongly Disagree

*Segment...*
*... is attractive for walking*
*... is attractive for cycling*
*...feels safe for walking*
*...feels safe for cycling*

Response to the "attractive" question should answer the question: "would you want to walk/bike this segment?" This includes finding the area aesthetically pleasing and existence of destinations.

Response to the "safe" question for walking should take into consideration not only walking along the sidewalk but crossing the street. The administrator should think of walking the segment with a 10 year old child. Would a child be safe walking the segment?

Response to the "safe" question for cycling should take into consideration existence of a bicycle lane and speed of local traffic. A segment can only score a 1 in this question if the traffic goes below 25 miles an hour or there is a formal bicycle lane present.

For more information on the Pedestrian Environment Data Scan, please contact:

Kelly J. Clifton, Ph.D.
Urban Studies and Planning Program
National Center for Smart Growth
Preinkert Field House
University of Maryland
College Park, MD 20742
Telephone: (301) 405-194
Email: kclifton@umd.edu

Name: _____   Date: _____   Study Area: _____

Segment Number: _____   Time: _____   Weather: _____

**0. Segment type**

| | |
|---|---|
| Low volume road | 1 |
| High volume road | 2 |
| Bike or Ped path - skip section C | 3 |

**A. Environment**

**1. Uses in Segment** *(all that apply)*

| | |
|---|---|
| Housing - Single Family Detached | 1 |
| Housing - Multi-Family | 2 |
| Housing - Mobile Homes | 3 |
| Office/Institutional | 4 |
| Restaurant/Café/Commercial | 5 |
| Industrial | 6 |
| Vacant/Undeveloped | 7 |
| Recreation | 8 |

**2. Slope**

| | |
|---|---|
| Flat | 1 |
| Slight hill | 2 |
| Steep hill | 3 |

**3. Segment Intersections**

| | |
|---|---|
| Segment has 3 way intersection | 1 |
| Segment has 4 way intersection | 2 |
| Segment has other intersection | 3 |
| Segment deadends but path continues | 4 |
| Segment deadends | 5 |
| Segment has no intersections | 6 |

**B. Pedestrian Facility** *(skip if none present)*

**4. Type(s) of pedestrian facility** *(all that apply)*

| | |
|---|---|
| Footpath (worn dirt path) | 1 |
| Paved Trail | 2 |
| Sidewalk | 3 |
| Pedestrian Street (closed to cars) | 4 |

*The rest of the questions in section B refer to the best pedestrian facility selected above.*

**5. Path material** *(all that apply)*

| | |
|---|---|
| Asphalt | 1 |
| Concrete | 2 |
| Paving Bricks or Flat Stone | 3 |
| Gravel | 4 |
| Dirt or Sand | 5 |

**6. Path condition/maintenance**

| | |
|---|---|
| Poor (many bumps/cracks/holes) | 1 |
| Fair (some bumps/cracks/holes) | 2 |
| Good (very few bumps/cracks/holes) | 3 |
| Under Repair | 4 |

**7. Path obstructions** *(all that apply)*

| | |
|---|---|
| Poles or Signs | 1 |
| Parked Cars | 2 |
| Greenery | 3 |
| Garbage Cans | 4 |
| Other | 5 |
| None | 6 |

**8. Buffers between road and path** *(all that apply)*

| | |
|---|---|
| Fence | 1 |
| Tress | 2 |
| Hedges | 3 |
| Landscape | 4 |
| Grass | 5 |
| None | 6 |

**9. Path Distance from Curb**

| | |
|---|---|
| At edge | 1 |
| < 5 feet | 2 |
| > 5 feel | 3 |

**10. Sidewalk Width**

| | |
|---|---|
| < 4 feet | 1 |
| Between 4 and 8 feet | 2 |
| > 8 feet | 3 |

---

*If no sidewalk, skip now to section C.*

**11. Curb cuts**

| | |
|---|---|
| None | 1 |
| 1 to 4 | 2 |
| > 4 | 3 |

**12. Sidewalk completeness/continuity**

| | |
|---|---|
| Sidewalk is complete | 1 |
| Sidewalk is incomplete | 2 |

**13. Sidewalk connectivity to other sidewalks/crosswalks**

number of connections ___

**C. Road Attributes** *(skip if path only)*

**14. Condition of road**

| | |
|---|---|
| Poor (many bumps/cracks/holes) | 1 |
| Fair (some bumps/cracks/holes) | 2 |
| Good (very few bumps/cracks/holes) | 3 |
| Under Repair | 4 |

**15. Number of lanes**

| | |
|---|---|
| Minimum # of lanes to cross ___ | 1 |
| Maximum # of lanes to cross ___ | 1 |

**16. Posted speed limit**

| | |
|---|---|
| None posted | 1 |
| (mph): ___ | 1 |

**17. On-Street parking** *(if pavement is unmarked, check only if cars parked)*

| | |
|---|---|
| Parallel or Diagonal | 1 |
| None | 2 |

**18. Off-street parking lot spaces**

| 0-5 | 6-25 | 26+ |
|---|---|---|
| 1 | 2 | 3 |

**19. Must you walk through a parking lot to get to most buildings?**

| | |
|---|---|
| Yes | 1 |
| No | 2 |

**20. Presence of med-hi volume driveways**

| | |
|---|---|
| < 2 | 1 |
| 2 to 4 | 2 |
| > 4 | 3 |

**21. Traffic control devices** *(all that apply)*

| | |
|---|---|
| Traffic light | 1 |
| Stop sign | 2 |
| Traffic circle | 3 |
| Speed bumps | 4 |
| Chicanes or chokers | 5 |
| None | 6 |

**22. Crosswalks**

| | |
|---|---|
| None | 1 |
| 1 to 2 | 2 |
| 3 to 4 | 3 |
| > 4 | 4 |

**23. Crossing Aids** *(all that apply)*

| | |
|---|---|
| Yield to Ped Paddles | 1 |
| Pedestrian Signal | 2 |
| Median/Traffic Island | 3 |
| Curb Extension | 4 |
| Overpass/Underpass | 5 |
| Pedestrian Crossing Warning Sign | 6 |
| Flashing Warning Light | 7 |
| Share the Road Warnign Sign | 8 |
| None | 9 |

---

**24. Bicycle facilities** *(all that apply)*

| | |
|---|---|
| Bicycle route signs | 1 |
| Striped bicycle lane designation | 2 |
| Visible bicycle parking facilities | 3 |
| Bicycle crossing warning | 4 |
| No bicycle facilities | 5 |

**D. Walking/Cycling Environment**

**25. Roadway/path lighting**

| | |
|---|---|
| Road-oriented lighting | 1 |
| Pedestrian-scale lighting | 2 |
| Other lighting | 3 |
| No lighting | 4 |

**26. Amenities** *(all that apply)*

| | |
|---|---|
| Public garbage cans | 1 |
| Benches | 2 |
| Water fountain | 3 |
| Street vendors/vending machines | 4 |
| No amenities | 5 |

**27. Are there wayfinding aids?**

| | |
|---|---|
| No | 1 |
| Yes | 2 |

**28. Number of trees shading walking area**

| | |
|---|---|
| None or Very Few | 1 |
| Some | 2 |
| Many/Dense | 3 |

**29. Degree of enclosure**

| | |
|---|---|
| Little or no enclosure | 1 |
| Some enclosure | 2 |
| Highly enclosed | 3 |

**30. Powerlines along segment?**

| | |
|---|---|
| Low Voltage/Distribution Line | 1 |
| High Voltage/Transmission Line | 2 |
| None | 3 |

**31. Overall cleanliness and building maintenance**

| | |
|---|---|
| Poor (much litter/graffiti/broken facilities) | 1 |
| Fair (some litter/graffiti/broken facilities) | 2 |
| Good (no litter/graffiti/broken facilities) | 3 |

**32. Articulation in building designs**

| | |
|---|---|
| Little or no articulation | 1 |
| Some articulation | 2 |
| Highly articulated | 3 |

**33. Building setbacks from sidewalk**

| | |
|---|---|
| At edge of sidewalk | 1 |
| Within 20 feet of sidewalk | 2 |
| More than 20 feet from sidewalk | 3 |

**34. Building height**

| | |
|---|---|
| Short | 1 |
| Medium | 2 |
| Tall | 3 |

**35. Bus stops**

| | |
|---|---|
| Bus stop with shelter | 1 |
| Bus stop with bench | 2 |
| Bus stop with signage only | 3 |
| No bus stop | 4 |

**Subjective Assessment: Segment**

Enter 1,2,3, or 4 for 1=Strongly Agree 2= Agree, 3=Disagree, 4=Strongly  Disagree

| | |
|---|---|
| .....is attractive for walking. | 1 |
| .....is attractive for cycling. | 1 |
| .....feels safe for walking. | 1 |
| .....feels safe for cycling. | 1 |

Kelly J. Clifton, PhD - National Center for Smart Growth - University of Maryland, College Park

# Walkability Checklist

# How walkable is your community?

## Take a walk with a child and decide for yourselves.

Everyone benefits from walking. These benefits include: improved fitness, cleaner air, reduced risks of certain health problems, and a greater sense of community. But walking needs to be safe and easy. Take a walk with your child and use this checklist to decide if your neighborhood is a friendly place to walk. Take heart if you find problems, there are ways you can make things better.



## Getting started:

First, you'll need to pick a place to walk, like the route to school, a friend's house or just somewhere fun to go. The second step involves the checklist. Read over the checklist before you go, and as you walk, note the locations of things you would like to change. At the end of your walk, give each question a rating. Then add up the numbers to see how you rated your walk overall. After you've rated your walk and identified any problem areas, the next step is to figure out what you can do to improve your community's score. You'll find both immediate answers and long-term solutions under "Improving Your Community's Score..." on the third page.




U.S. Department of Transportation
**Federal Highway Administration**


U.S. Department of Transportation
**National Highway Traffic Safety Administration**




**SafeRoutes**
National Center for Safe Routes to School


**Pedestrian and Bicycle Information Center**

Take a walk and use this checklist to rate your neighborhood's walkability.

# How walkable is your community?

## Location of walk

## Rating Scale:

| 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| awful | many problems | some problems | good | very good | excellent |

## 1. Did you have room to walk?

☐ Yes ☐ Some problems:
- ☐ Sidewalks or paths started and stopped
- ☐ Sidewalks were broken or cracked
- ☐ Sidewalks were blocked with poles, signs, shrubbery, dumpsters, etc.
- ☐ No sidewalks, paths, or shoulders
- ☐ Too much traffic
- ☐ Something else _____

**Rating:** (circle one)     Locations of problems:
1 2 3 4 5 6     _____

## 2. Was it easy to cross streets?

☐ Yes ☐ Some problems:
- ☐ Road was too wide
- ☐ Traffic signals made us wait too long or did not give us enough time to cross
- ☐ Needed striped crosswalks or traffic signals
- ☐ Parked cars blocked our view of traffic
- ☐ Trees or plants blocked our view of traffic
- ☐ Needed curb ramps or ramps needed repair
- Something else _____

**Rating:** (circle one)     Locations of problems:
1 2 3 4 5 6     _____

## 3. Did drivers behave well?

☐ Yes ☐ Some problems: Drivers ...
- ☐ Backed out of driveways without looking
- ☐ Did not yield to people crossing the street
- ☐ Turned into people crossing the street
- ☐ Drove too fastp
- ☐ Sped up to make it through traffic lights or drove through traffic lights?
- ☐ Something else _____

**Rating:** (circle one)     Locations of problems:
1 2 3 4 5 6     _____

## 4. Was it easy to follow safety rules? Could you and your child...

☐ Yes ☐ No   Cross at crosswalks or where you could see and be seen by drivers?

☐ Yes ☐ No   Stop and look left, right and then left again before crossing streets?

☐ Yes ☐ No   Walk on sidewalks or shoulders facing traffic where there were no sidewalks?

☐ Yes ☐ No   Cross with the light?

**Rating:** (circle one)     Locations of problems:
1 2 3 4 5 6     _____

## 5. Was your walk pleasant?

☐ Yes ☐ Some problems:
- ☐ Needed more grass, flowers, or trees
- ☐ Scary dogs
- ☐ Scary people
- ☐ Not well lighted
- ☐ Dirty, lots of litter or trash
- ☐ Dirty air due to automobile exhaust
- ☐ Something else _____

**Rating:** (circle one)     Locations of problems:
1 2 3 4 5 6     _____

## How does your neighborhood stack up? Add up your ratings and decide.

1. _____
2. _____
3. _____
4. _____
5. _____
Total: _____

| | |
|---|---|
| 26–30 | Celebrate! You have a great neighborhood for walking. |
| 21–25 | Celebrate a little. Your neighborhood is pretty good. |
| 16–20 | Okay, but it needs work. |
| 11–15 | It needs lots of work. You deserve better than that. |
| 5–10 | It's a disaster for walking! |

Now that you've identified the problems, go to the next page to find out how to fix them.

## Now that you know the problems, you can find the answers.

# Improving your community's score

| 1. Did you have room to walk? | What you and your child can do immediately | What you and your community can do with more time |
| --- | --- | --- |
| Sidewalks or paths started and stopped<br>Sidewalks broken or cracked<br>Sidewalks blocked<br>No sidewalks, paths or shoulders<br>Too much traffic | • pick another route for now<br>• tell local traffic engineering or public works department about specific problems and provide a copy of the checklist | • speak up at board meetings<br>• write or petition city for walkways and gather neighborhood signatures<br>• make media aware of problem<br>• work with a local transportation engineer to develop a plan for a safe walking route |

## 2. Was it easy to cross streets?

| | | |
| --- | --- | --- |
| Road too wide<br>Traffic signals made us wait too long or did not give us enough time to cross<br>Crosswalks/traffic signals needed<br>View of traffic blocked by parked cars, trees, or plants<br>Needed curb ramps or ramps needed repair | • pick another route for now<br>• share problems and checklist with local traffic engineering or public works department<br>• trim your trees or bushes that block the street and ask your neighbors to do the same<br>• leave nice notes on problem cars asking owners not to park there | • push for crosswalks/signals/ parking changes/curb ramps at city meetings<br>• report to traffic engineer where parked cars are safety hazards<br>• report illegally parked cars to the police<br>• request that the public works department trim trees or plants<br>• make media aware of problem |

## 3. Did drivers behave well?

| | | |
| --- | --- | --- |
| Backed without looking<br>Did not yield<br>Turned into walkers<br>Drove too fast<br>Sped up to make traffic lights or drove through red lights | • pick another route for now<br>• set an example: slow down and be considerate of others<br>• encourage your neighbors to do the same<br>• report unsafe driving to the police | • petition for more enforcement<br>• request protected turns<br>• ask city planners and traffic engineers for traffic calming ideas<br>• ask schools about getting crossing guards at key locations<br>• organize a neighborhood speed watch program |

## 4. Could you follow safety rules?

| | | |
| --- | --- | --- |
| Cross at crosswalks or where you could see and be seen<br>Stop and look left, right, left before crossing<br>Walk on sidewalks or shoulders facing traffic<br>Cross with the light | • educate yourself and your child about safe walking<br>• organize parents in your neighborhood to walk children to school | • encourage schools to teach walking safely<br>• help schools start safe walking programs<br>• encourage corporate support for flex schedules so parents can walk children to school |

## 5. Was your walk pleasant?

| | | |
| --- | --- | --- |
| Needs grass, flowers, trees<br>Scary dogs<br>Scary people<br>Not well lit<br>Dirty, litter<br>Lots of traffic | • point out areas to avoid to your child; agree on safe routes<br>• ask neighbors to keep dogs leashed or fenced<br>• report scary dogs to the animal control department<br>• report scary people to the police<br>• report lighting needs to the police or appropriate public works department<br>• take a walk wih a trash bag<br>• plant trees, flowers in your yard<br>• select alternative route with less traffic | • request increased police enforcement<br>• start a crime watch program in your neighborhood<br>• organize a community clean-up day<br>• sponsor a neighborhood beautification or tree-planting day<br>• begin an adopt-a-street program<br>• initiate support to provide routes with less traffic to schools in your community (reduced traffic during am and pm school commute times) |

## A Quick Health Check

| | | |
| --- | --- | --- |
| Could not go as far or as fast as we wanted<br>Were tired, short of breath or had sore feet or muscles<br>Was the sun really hot?<br>Was it hot and hazy? | • start with short walks and work up to 30 minutes of walking most days<br>• invite a friend or child along<br>• walk along shaded routes where possible<br>• use sunscreen of SPF 15 or higher, wear a hat and sunglasses<br>• try not to walk during the hottest time of day | • get media to do a story about the health benefits of walking<br>• call parks and recreation department about community walks<br>• encourage corporate support for employee walking programs<br>• plant shade trees along routes<br>• have a sun safety seminar for kids<br>• have kids learn about unhealthy ozone days and the Air Quality Index (AQI) |

Need some guidance? These resources might help...

# Great Resources

## WALKING INFORMATION

**Pedestrian and Bicycle Information Center (PBIC)**
UNC Highway Safety Research Center
Chapel Hill, NC
www.pedbikeinfo.org
www.walkinginfo.org

**National Center for Safe Routes to School**
Chapel Hill, NC
www.saferoutesinfo.org

**For More Information about Who Can Help
Address Community Problems**
www.walkinginfo.org/problems/help.cfm

**State Bicycle & Pedestrian Coordinators**
http://www.walkinginfo.org/assistance/contacts.cfm

## FEDERAL POLICY, GUIDANCE AND FUNDING SOURCES FOR WALKING FACILITIES

**Federal Highway Administration**
Bicycle and Pedestrian Program
Office of Natural and Human Environment
Washington, DC
www.fhwa.dot.gov/environment/bikeped/index.htm

## PEDESTRIAN SAFETY

**Federal Highway Administration**
Pedestrian and Bicycle Safety Team
Office Of Safety
Washington, DC
http://safety.fhwa.dot.gov/ped_bike/

**National Highway Traffic Safety Administration**
Traffic Safety Programs
Washington, DC
www.nhtsa.gov/Pedestrians

## SIDEWALK ACCESSIBILITY INFORMATION

**US Access Board**
Washington, DC
Phone: (800) 872-2253;
(800) 993-2822 (TTY)
www.access-board.gov









# TRAFFIC SAFETY FACTS

DOT HS 811 748

August 2013

# Pedestrians

In 2011, 4,432 pedestrians were killed and an estimated 69,000 were injured in traffic crashes in the United States. On average, a pedestrian was killed every two hours and injured every eight minutes in traffic crashes.

A pedestrian, as defined for the purpose of this Traffic Safety Fact Sheet, is any person on foot, walking, running, jogging, hiking, sitting or lying down who is involved in a motor vehicle traffic crash. Also, a traffic crash is defined as an incident that involves one or more vehicles where at least one vehicle is in transport and the crash originates on a public trafficway. Crashes that occurred exclusively on private property, including parking lots and driveways, were excluded.

The 4,432 pedestrian fatalities in 2011 were an increase of 3 percent from 2010, but a decrease of 7 percent from 2002. In 2011, pedestrian deaths accounted for 14 percent of all traffic fatalities, and made up 3 percent of all the people injured in traffic crashes (Table 1).

> *In 2011, 4,432 pedestrians died in traffic crashes — a 3-percent increase from the number reported in 2010.*

Table 1
**Total Fatalities and Pedestrian Fatalities in Traffic Crashes, 2002–2011**

| | | | |
|---|---|---|---|
| 2002 | 43,005 | 4,851 | 11 |
| 2003 | 42,884 | 4,774 | 11 |
| 2004 | 42,836 | 4,675 | 11 |
| 2005 | 43,510 | 4,892 | 11 |
| 2006 | 42,708 | 4,795 | 11 |
| 2007 | 41,259 | 4,699 | 11 |
| 2008 | 37,423 | 4,414 | 12 |
| 2009 | 33,883 | 4,109 | 12 |
| 2010 | 32,999 | 4,302 | 13 |
| 2011 | 32,367 | 4,432 | 14 |

In 2011, almost three-fourths (73%) of pedestrian fatalities occurred in an urban setting versus a rural setting. Over two-thirds (70%) of pedestrian fatalities occurred at non-intersections versus at intersections. Eighty-eight percent of pedestrian fatalities occurred during normal weather conditions (clear/cloudy), compared to rain, snow and foggy conditions. A majority of the pedestrian fatalities, 70 percent, occurred during the nighttime (6 p.m. – 5:59 a.m). Between 2010 and 2011 all these percentages stayed relatively level (Table 2).

*In 2011, pedestrian deaths accounted for 14 percent of all traffic fatalities in motor vehicle traffic crashes. Since 2002, the number of pedestrian fatalities has decreased by 7 percent.*

Table 2
**Percentage of Pedestrian Fatalities in Relation to Land Use, Non-Motorist Location, Weather and Time of Day**

| | | |
|---|---|---|
| **Land Use** | | |
| Rural | 27% | 27% |
| Urban | 73% | 73% |
| **Non-Motorist Location** | | |
| Intersection | 21% | 19% |
| Non-Intersection | 68% | 70% |
| Other | 10% | 10% |
| **Weather** | | |
| Clear/Cloudy | 88% | 88% |
| Rain | 9% | 9% |
| Snow | 1% | 1% |
| Fog | 1% | 1% |
| **Time of Day\*** | | |
| Daytime | 32% | 30% |
| Nighttime | 68% | 70% |

Note: Percentage of unknown values are not displayed.
\* Daytime: 6 a.m.–5:59 p.m. Nighttime: 6 p.m.–5:59 a.m.

## Age

Older pedestrians (age 65+) accounted for 19 percent (844) of all pedestrian fatalities and an estimated 10 percent (7,000) of all pedestrians injured in 2011 (Table 3).

In 2011, the fatality rate for older pedestrians (age 65+) was 2.04 per 100,000 population – higher than the rate for all the other ages (Table 4).

In 2011, over one-fifth (21%) of all children between the ages of 10 and 15 who were killed in traffic crashes were pedestrians. Children age 15 and younger accounted for 6 percent of the pedestrian fatalities in 2011 and 19 percent of all pedestrians injured in traffic crashes (Table 3).

Table 3
## Motor Vehicle Traffic Crash Fatalities and Injuries and Pedestrians Killed or Injured, by Age Group, 2011

| Age Group | Total Killed | Pedestrians Killed | Percent Pedestrians Killed |
|---|---|---|---|
| <5 | 360 | 70 | 19 |
| 5–9 | 344 | 63 | 18 |
| 10–15 | 637 | 131 | 21 |
| 16–20 | 3,410 | 252 | 7 |
| 21–24 | 3,282 | 305 | 9 |
| 25–29 | 3,077 | 343 | 11 |
| 30–34 | 2,420 | 282 | 12 |
| 35–39 | 2,095 | 277 | 13 |
| 40–44 | 2,228 | 287 | 13 |
| 45–49 | 2,443 | 409 | 17 |
| 50–54 | 2,634 | 487 | 18 |
| 55–59 | 2,152 | 356 | 17 |
| 60–64 | 1,824 | 300 | 16 |
| 65–69 | 1,349 | 214 | 16 |
| 70–74 | 1,182 | 195 | 16 |
| 75–79 | 1,025 | 177 | 17 |
| 80+ | 1,840 | 258 | 14 |
| Unknown | 65 | 26 | 40 |
| **Total** | **32,367** | **4,432** | **14** |

*In 2011, almost one-fifth of the children between the ages of 5 and 9 killed in traffic crashes were pedestrians.*

| Age Group | Total Injured | Pedestrians Injured | Percent Pedestrians Injured |
|---|---|---|---|
| <5 | 48,000 | 2,000 | 4 |
| 5–9 | 56,000 | 4,000 | 6 |
| 10–15 | 89,000 | 7,000 | 8 |
| 16–20 | 296,000 | 9,000 | 3 |
| 21–24 | 232,000 | 6,000 | 3 |
| 25–29 | 236,000 | 6,000 | 2 |
| 30–34 | 181,000 | 4,000 | 2 |
| 35–39 | 171,000 | 4,000 | 2 |
| 40–44 | 161,000 | 4,000 | 3 |
| 45–49 | 167,000 | 4,000 | 2 |
| 50–54 | 158,000 | 5,000 | 3 |
| 55–59 | 133,000 | 4,000 | 3 |
| 60–64 | 103,000 | 4,000 | 4 |
| 65–69 | 63,000 | 2,000 | 4 |
| 70–74 | 45,000 | 2,000 | 4 |
| 75–79 | 33,000 | 1,000 | 2 |
| 80+ | 43,000 | 2,000 | 5 |
| **Total** | **2,217,000** | **69,000** | **3** |

Note: Totals may not equal sum of components due to independent rounding

4

## Gender

In 2011, more than two-thirds (70%) of the pedestrians killed were males, and the male pedestrian fatality rate per 100,000 population was 2.01 — more than double the rate for females (0.85 per 100,000 population). The male pedestrian injury rate per 100,000 population was 24, compared with 20 for female (Table 4).

Table 4
### Pedestrians Killed and Injured and Fatality and Injury Rates by Age and Sex, 2011

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| <5 | 43 | 10,300 | 0.42 | 27 | 9,863 | 0.27 | 70 | 20,162 | 0.35 |
| 5–9 | 36 | 10,384 | 0.35 | 27 | 9,950 | 0.27 | 63 | 20,334 | 0.31 |
| 10–15 | 83 | 12,717 | 0.65 | 48 | 12,145 | 0.40 | 131 | 24,862 | 0.53 |
| 16–20 | 173 | 11,339 | 1.53 | 79 | 10,745 | 0.74 | 252 | 22,083 | 1.14 |
| 21–24 | 232 | 8,963 | 2.59 | 73 | 8,594 | 0.85 | 305 | 17,558 | 1.74 |
| 25–34 | 432 | 21,044 | 2.05 | 193 | 20,746 | 0.93 | 625 | 41,790 | 1.50 |
| 35–44 | 392 | 20,223 | 1.94 | 172 | 20,404 | 0.84 | 564 | 40,628 | 1.39 |
| 45–54 | 662 | 22,019 | 3.01 | 234 | 22,699 | 1.03 | 896 | 44,718 | 2.00 |
| 55–64 | 492 | 18,358 | 2.68 | 164 | 19,704 | 0.83 | 656 | 38,062 | 1.72 |
| 65–74 | 266 | 10,476 | 2.54 | 143 | 12,005 | 1.19 | 409 | 22,482 | 1.82 |
| 75–84 | 185 | 5,573 | 3.32 | 121 | 7,602 | 1.59 | 306 | 13,175 | 2.32 |
| 85 + | 70 | 1,894 | 3.70 | 59 | 3,843 | 1.54 | 129 | 5,737 | 2.25 |
| **Total¹** | **3,086** | **153,291** | **2.01** | **1,345** | **158,301** | **0.85** | **4,432** | **311,592** | **1.42** |
| | | | | | | | | | |
| <5 | 1,000 | 10,300 | 12 | 1,000 | 9,863 | 5 | 2,000 | 20,162 | 9 |
| 5–9 | 2,000 | 10,384 | 20 | 1,000 | 9,950 | 14 | 4,000 | 20,334 | 17 |
| 10–15 | 4,000 | 12,717 | 34 | 3,000 | 12,145 | 22 | 7,000 | 24,862 | 28 |
| 16–20 | 5,000 | 11,339 | 43 | 4,000 | 10,745 | 37 | 9,000 | 22,083 | 40 |
| 21–24 | 4,000 | 8,963 | 41 | 2,000 | 8,594 | 27 | 6,000 | 17,558 | 34 |
| 25–34 | 5,000 | 21,044 | 22 | 5,000 | 20,746 | 23 | 10,000 | 41,790 | 23 |
| 35–44 | 5,000 | 20,223 | 24 | 3,000 | 20,404 | 14 | 8,000 | 40,628 | 19 |
| 45–54 | 5,000 | 22,019 | 22 | 5,000 | 22,699 | 20 | 9,000 | 44,718 | 21 |
| 55–64 | 3,000 | 18,358 | 17 | 5,000 | 19,704 | 24 | 8,000 | 38,062 | 21 |
| 65–74 | 2,000 | 10,476 | 18 | 2,000 | 12,005 | 19 | 4,000 | 22,482 | 19 |
| 75–84 | 1,000 | 5,573 | 20 | 1,000 | 7,602 | 12 | 2,000 | 13,175 | 16 |
| 85 + | 0 | 1,894 | 26 | 0 | 3,843 | 11 | 1,000 | 5,737 | 16 |
| **Total²** | **37,000** | **153,291** | **24** | **32,000** | **158,301** | **20** | **69,000** | **311,592** | **22** |

* Rate per 100,000 population
** Less than 500 injured, injury rate not shown
¹Total killed includes 26 of unknown age.
²Note: Totals may not equal sum of components due to independent rounding.
**Source:** Fatalities—Fatality Analysis Reporting System, NHTSA.   Injured—General Estimates System, NHTSA.   Population—Bureau of the Census.

*Thirty-two percent of pedestrian fatalities occurred between 8 p.m. and 11:59 p.m.*

## Time of Day and Day of Week

Thirty-two percent of the pedestrian fatalities occurred in crashes between 8 p.m. and 11:59 p.m. The highest percentage of weekday and weekend fatalities also occurred between 8 p.m. and 11:59 p.m. (27% and 39%, respectively). The lowest occurred between noon and 3:59 p.m. (10% and 4%, respectively; Figure 1).

Figure 1
**Pedestrian Fatalities by Time of Day and Day of Week, 2011**



## Alcohol Involvement

Alcohol involvement — either for the driver or for the pedestrian — was reported in 48 percent of the traffic crashes that resulted in pedestrian fatalities. Of the pedestrians involved, 35 percent had a blood alcohol concentration (BAC) of .08 grams per deciliter (g/dL) or higher. Of the drivers involved in these fatal crashes, only 13 percent had a BAC of .08 g/dL or higher (Table 5).

Of the pedestrians who were killed in fatal crashes, 37 percent had a BAC of .08 g/dL or higher. Pedestrians ages 25-34 who were killed had the highest percentage of alcohol impairment at 50 percent (Table 6).

*Alcohol involvement— either for the driver or the pedestrian—was reported in 48 percent of all fatal pedestrian crashes.*

Table 5
**Alcohol Involvement in Crashes That Resulted in Pedestrian Fatalities, 2011**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| No Pedestrian Alcohol Involvement | 2,262 | 52 | 66 | 2 | 297 | 7 | 2,625 | 60 |
| Pedestrian Alcohol Involvement, BAC .01–.07 g/dL | 152 | 3 | 11 | 0 | 30 | 1 | 192 | 4 |
| Pedestrian Alcohol Involvement, BAC .08 g/dL or Greater | 1,233 | 28 | 60 | 1 | 254 | 6 | 1,547 | 35 |
| **Total** | **3,647** | **84** | **136** | **3** | **581** | **13** | **4,365** | **100** |

**Note:** The alcohol levels in this table are determined using the alcohol levels of the pedestrians killed and the involved drivers (killed and other).

6

Table 6
**Alcohol Involvement for Pedestrians Killed in Fatal Crashes by Age, 2002 and 2011**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 16–20 | 284 | 62 | 6 | 32 | 38 | 252 | 70 | 5 | 25 | 30 |
| 21–24 | 246 | 44 | 7 | 49 | 56 | 305 | 48 | 4 | 49 | 52 |
| 25–34 | 602 | 46 | 5 | 49 | 54 | 625 | 46 | 4 | 50 | 54 |
| 35–44 | 859 | 42 | 5 | 53 | 58 | 564 | 47 | 6 | 47 | 53 |
| 45–54 | 813 | 50 | 5 | 45 | 50 | 896 | 46 | 6 | 48 | 54 |
| 55–64 | 499 | 65 | 5 | 30 | 35 | 656 | 61 | 4 | 35 | 39 |
| 65–74 | 468 | 82 | 3 | 15 | 18 | 409 | 81 | 3 | 16 | 19 |
| 75–84 | 430 | 92 | 2 | 7 | 8 | 306 | 90 | 3 | 7 | 10 |
| 85 + | 166 | 95 | 1 | 4 | 5 | 129 | 92 | 4 | 4 | 8 |
| Total* | 4,367 | 59 | 4 | 36 | 41 | 4,142 | 58 | 5 | 37 | 42 |

*Excludes pedestrians under 16 years old and pedestrians of unknown age.

**For more information:**

Information on traffic fatalities is available from the National Center for Statistics and Analysis (NCSA), NVS-424, 1200 New Jersey Avenue SE., Washington, DC 20590. NCSA can be contacted at 800-934-8517 or via the follow-ing e-mail address: ncsaweb@dot.gov. General information on highway traffic safety can be accessed by Internet users at www.nhtsa.gov/NCSA. To report a safety-related problem or to inquire about motor vehicle safety information, contact the Vehicle Safety Hotline at 888-327-4236.

Other fact sheets available from the National Center for Statistics and Analysis are *Alcohol-Impaired Driving, Bicyclists and Other Cyclists, Children, Large Trucks, Motorcycles, Occupant Protection, Older Population, Overview, Passenger Vehicles, Race and Ethnicity, Rural/Urban Comparisons, School Transportation-Related Crashes, Speeding, State Alcohol Estimates, State Traffic Data,* and *Young Drivers.* Detailed data on motor vehicle traffic crashes are published annually in *Traffic Safety Facts: A Compilation of Motor Vehicle Crash Data from the Fatality Analysis Reporting System and the General Estimates System.* The fact sheets and annual Traffic Safety Facts report can be accessed online at www-nrd.nhtsa.dot.gov/CATS/index.aspx.



U.S. Department
of Transportation

**National Highway
Traffic Safety
Administration**

# Important Safety Reminders

### For Pedestrians:

- Walk on a sidewalk or path whenever they are available.

- If there is no sidewalk or path available, walk facing traffic (on the left side of the road) on the shoulder, as far away from traffic as possible. Keep alert at all times; don't be distracted by electronic devices, including radios, smart phones and other devices that take your eyes (and ears) off the road environment.

- Be cautious night and day when sharing the road with vehicles. Never assume a driver sees you (he or she could be distracted, under the influence of alcohol and/or drugs, or just not seeing you). Try to make eye contact with drivers as they approach you to make sure you are seen.

- Be predictable as a pedestrian. Cross streets at crosswalks or intersections whenever possible. This is where drivers expect pedestrians.

- If a crosswalk or intersection is not available, locate a well-lit area, wait for a gap in traffic that allows you enough time to cross safely, and continue to watch for traffic as you cross.

- Stay off of freeways, restricted-access highways and other pedestrian-prohibited roadways.

- Be visible at all times. Wear bright clothing during the day, and wear reflective materials or use a flash light at night.

- Avoid alcohol and drugs when walking; they impair your abilities and judgment too.

### For Drivers:

- Look out for pedestrians everywhere, at all times. Very often pedestrians are not walking where they should be.

- Be especially vigilant for pedestrians in hard-to-see conditions, such as nighttime or in bad weather.

- Slowdown and be prepared to stop when turning or otherwise entering a crosswalk.

- Always stop for pedestrians in crosswalks and stop well back from the crosswalk to give other vehicles an opportunity to see the crossing pedestrians so they can stop too.

- Never pass vehicles stopped at a crosswalk. They are stopped to allow pedestrians to cross the street.

- Never drive under the influence of alcohol and/or drugs.

- Follow the speed limit, especially around pedestrians.

- Follow slower speed limits in school zones and in neighborhoods where there are children present.

— NHTSA's Safety Countermeasures Division

Table 7

## Motor Vehicle Traffic Crash Fatalities, Pedestrian Traffic Fatalities, and Fatality Rates by State, 2011

| | | | | | |
|---|---|---|---|---|---|
| Alabama | 894 | 4,802,740 | 79 | 8.8 | 1.64 |
| Alaska | 72 | 722,718 | 9 | 12.5 | 1.25 |
| Arizona | 825 | 6,482,505 | 147 | 17.8 | 2.27 |
| Arkansas | 549 | 2,937,979 | 42 | 7.7 | 1.43 |
| California | 2,791 | 37,691,912 | 625 | 22.4 | 1.66 |
| Colorado | 447 | 5,116,796 | 45 | 10.1 | 0.88 |
| Connecticut | 220 | 3,580,709 | 26 | 11.8 | 0.73 |
| Delaware | 99 | 907,135 | 18 | 18.2 | 1.98 |
| Dist of Columbia | 27 | 617,996 | 8 | 29.6 | 1.29 |
| Florida | 2,398 | 19,057,542 | 490 | 20.4 | 2.57 |
| Georgia | 1,223 | 9,815,210 | 130 | 10.6 | 1.32 |
| Hawaii | 100 | 1,374,810 | 23 | 23.0 | 1.67 |
| Idaho | 167 | 1,584,985 | 9 | 5.4 | 0.57 |
| Illinois | 918 | 12,869,257 | 134 | 14.6 | 1.04 |
| Indiana | 750 | 6,516,922 | 61 | 8.1 | 0.94 |
| Iowa | 360 | 3,062,309 | 25 | 6.9 | 0.82 |
| Kansas | 386 | 2,871,238 | 14 | 3.6 | 0.49 |
| Kentucky | 721 | 4,369,356 | 50 | 6.9 | 1.14 |
| Louisiana | 675 | 4,574,836 | 88 | 13.0 | 1.92 |
| Maine | 136 | 1,328,188 | 10 | 7.4 | 0.75 |
| Maryland | 485 | 5,828,289 | 102 | 21.0 | 1.75 |
| Massachusetts | 337 | 6,587,536 | 58 | 17.2 | 0.88 |
| Michigan | 889 | 9,876,187 | 138 | 15.5 | 1.40 |
| Minnesota | 368 | 5,344,861 | 39 | 10.6 | 0.73 |
| Mississippi | 630 | 2,978,512 | 47 | 7.5 | 1.58 |
| Missouri | 784 | 6,010,688 | 75 | 9.6 | 1.25 |
| Montana | 209 | 998,199 | 15 | 7.2 | 1.50 |
| Nebraska | 181 | 1,842,641 | 7 | 3.9 | 0.38 |
| Nevada | 246 | 2,723,322 | 46 | 18.7 | 1.69 |
| New Hampshire | 90 | 1,318,194 | 5 | 5.6 | 0.38 |
| New Jersey | 627 | 8,821,155 | 142 | 22.6 | 1.61 |
| New Mexico | 353 | 2,082,224 | 41 | 11.6 | 1.97 |
| New York | 1,169 | 19,465,197 | 287 | 24.6 | 1.47 |
| North Carolina | 1,227 | 9,656,401 | 160 | 13.0 | 1.66 |
| North Dakota | 148 | 683,932 | 9 | 6.1 | 1.32 |
| Ohio | 1,016 | 11,544,951 | 104 | 10.2 | 0.90 |
| Oklahoma | 696 | 3,791,508 | 43 | 6.2 | 1.13 |
| Oregon | 331 | 3,871,859 | 46 | 13.9 | 1.19 |
| Pennsylvania | 1,286 | 12,742,886 | 147 | 11.4 | 1.15 |
| Rhode Island | 66 | 1,051,302 | 14 | 21.2 | 1.33 |
| South Carolina | 828 | 4,679,230 | 113 | 13.6 | 2.41 |
| South Dakota | 111 | 824,082 | 7 | 6.3 | 0.85 |
| Tennessee | 946 | 6,403,353 | 80 | 8.5 | 1.25 |
| Texas | 3,016 | 25,674,681 | 421 | 14.0 | 1.64 |
| Utah | 240 | 2,817,222 | 30 | 12.5 | 1.06 |
| Vermont | 55 | 626,431 | 3 | 5.5 | 0.48 |
| Virginia | 764 | 8,096,604 | 73 | 9.6 | 0.90 |
| Washington | 457 | 6,830,038 | 64 | 14.0 | 0.94 |
| West Virginia | 337 | 1,855,364 | 20 | 5.9 | 1.08 |
| Wisconsin | 582 | 5,711,767 | 57 | 9.8 | 1.00 |
| Wyoming | 135 | 568,158 | 6 | 4.4 | 1.06 |
| U.S. Total | 32,367 | 311,591,917 | 4,432 | 13.7 | 1.42 |
| Puerto Rico | 359 | 3,706,690 | 110 | 30.6 | 2.97 |

Note: Totals may not equal sum of components due to independent rounding.
**Sources:** Fatalities — Fatality Analysis Reporting System, NHTSA.  Population — Bureau of the Census.